## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

       Plaintiff,

  v.                                 Case No. 22-CV-1149

LAKESIDE PLASTICS,

       Defendant.

---

## DEFENDANT, LAKESIDE PLASTICS', MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

### <u>INTRODUCTION</u>

Defendant, Lakeside Plastics ("Lakeside"), respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment. The Plaintiff, Equal Employment Opportunity Commission ("EEOC"), alleges that Lakeside violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), by discriminating against a temporary employee, Brian Turner ("Turner"), by subjecting him to a hostile work environment based upon his race (Black) and terminating his employment based upon his race. The EEOC also alleges, in the alternative, that Lakeside terminated Turner's employment in retaliation for engaging in protected activity or due to the intersection of his race and engaging in protected activity.

The Court should grant summary judgment in favor of Lakeside on all of the EEOC's claims. As to its first claim, the EEOC cannot prove that Lakeside discriminated against Turner by subjecting him to a hostile work environment based upon race. The EEOC cannot show that the

1

alleged harassment was so severe or pervasive so as to create a hostile work environment. In addition, the EEOC cannot prove that there is a basis for employer liability.

As to the EEOC's second claim, the EEOC cannot prove that Lakeside terminated Turner's assignment at Lakeside due to his race. It cannot show that Turner's job performance met Lakeside's legitimate expectations. In addition, the EEOC cannot show that another similarly situated individual who was not in the protected class was treated more favorably than Turner. There is no evidence of a similarly situated employee outside of Turner's protected class who was treated more favorably and also demonstrated poor attendance, work performance issues, inability to take direction, and inability to get along with others, over a short period of time.

As to the EEOC's third claim, the EEOC cannot prove that Lakeside terminated Turner's assignment with Lakeside in retaliation for engaging in protected activity or due to his race and engaging in protected activity. As an initial matter, the EEOC cannot prove that Turner engaged in a statutorily protected activity. Even construing the facts in the light most favorable to the EEOC, as the non-moving party, that Turner reported the alleged incidents to Leads at Lakeside and that such reports constitute statutorily protected activity, the EEOC still cannot prove causation, that Turner was meeting Lakeside's legitimate expectations, or that Turner was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. Furthermore, the EEOC has not pled facts—and cannot prove—a claim of "intersectional discrimination" or a "race plus" claim. Therefore, summary judgment in favor of Lakeside is appropriate as to all of the EEOC's claims in this case.

## SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.

2

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law..." A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (citation omitted).

Additionally, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Under those circumstances, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322-23.

## ARGUMENT

## I.   THE EEOC CANNOT PROVE THAT LAKESIDE DISCRIMINATED AGAINST TURNER BY SUBJECTING HIM TO A HOSTILE WORK ENVIRONMENT BASED UPON RACE; THEREFORE, THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF LAKESIDE.

The EEOC first claims that Lakeside discriminated against Turner by subjecting him to a hostile work environment based upon his race. The Court should grant summary judgment in favor of Lakeside because the EEOC's allegations fail to support a claim for a hostile work environment. The EEOC cannot show that the alleged harassment was so severe or pervasive so as to alter the conditions of Turner's work environment by creating a hostile or abusive situation. The EEOC also cannot show that there is a basis for employer liability.

3

The EEOC must prove that Turner: (1) was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. See *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813–14 (7th Cir. 2022), citing *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016) (quoting *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009)).

Under the third element of the EEOC's claim, "[i]n determining whether conduct is severe or pervasive enough to alter the conditions of employment, courts must consider the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). In addition, when analyzing a hostile work environment claim, Courts consider the "entire context of the workplace…not the discrete acts of individual employees." *Vance v. Ball State Univ.*, 646 F.3d 461, 470–71 (7th Cir. 2011), aff'd, 570 U.S. 421, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013) (citation omitted).

In analyzing whether the use of racial epithets creates a hostile work environment, case law distinguishes between supervisors and co-workers. *Id.* at 814. The number of times a racial epithet is used is not necessarily indicative of a hostile work environment; rather, Courts consider the "totality of the circumstances when determining whether the conduct is sufficiently severe or pervasive to be actionable." *Id.* at 815; cf *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (holding that "[o]ne utterance alone does not create an objectively hostile work environment"); *see also Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (holding that "[s]ince the one-time use of a racial epithet is not severe enough to trigger liability, Nichols can only succeed if the totality of the collection of allegedly harassing incidents

4

triggers liability.") Further, Courts consider whether the harassing conduct was directed at the person. *Paschall*, 28 F.4th at 815.

The EEOC's claim that Lakeside discriminated against Turner by subjecting him to a hostile work environment based on his race centers on three (3) alleged incidents between Turner and a co-worker, Curt Moraski. In reviewing the totality of the circumstances and the context of the work environment, the EEOC cannot prove that the alleged harassment was so severe or pervasive so as to alter the conditions of his work environment by creating a hostile or abusive situation.

In the first alleged incident between Turner and Moraski, Turner and Moraski were engaging in a casual discussion getting to know each other. (Def. Prop. Material Facts, ¶75.) This conversation took place after Moraski had brought Turner home from work on two (2) occasions and Turner was appreciative of that. (*Id.*, ¶¶73-74.) Turner felt that Moraski was a down-to-earth person. (*Id.*, ¶72.) When they were discussing living in Milwaukee, Moraski made a comment that "[w]hile I was there, I used to knock niggers out on the south side." (*Id.*, ¶¶75-76.) According to Turner, he told Moraski that he did not care about that type of conversation, and Moraski said they could go out in the parking lot. (*Id.*, ¶77.) The conversation then ended, however, and Moraski walked away. (*Id.*, ¶79.) According to Turner's own account, Moraski did not direct the racial slur towards him, and Turner believed it to be different in nature than the second alleged incident. (*Id.*, ¶¶78, 80.)

In the second alleged incident between Turner and Moraski, which was off premises, Moraski pulled up his truck next to Turner while Turner was biking home. (*Id.*, ¶82.) According to Turner, Moraski first told Turner to get off his bike and fight and then said he would "knock [his] nigger ass out." (*Id.*, ¶84.) According to Turner, Moraski also stated, "I'm gonna hang your

5

nigger ass." (*Id.*) Turner told Moraski that he did not have time for it and Moraski drove off. (*Id.*, ¶85.) Turner then crossed the street, after which Moraski came back and made the same statements to him. (*Id*, ¶86.) According to Turner's own account, it was snowing when the alleged incident occurred, and he recalled it was going into the winter season. (*Id.*, ¶83.) Turner was assigned to Lakeside as a temporary employee from June 6, 2019 to June 30, 2019, however. (*Id.*, ¶¶1, 4.) After the second alleged incident between Turner and Moraski, Turner was not subjected to racial slurs at any other time. (*Id.*, ¶104.)

In the third alleged incident between Turner and Moraski, Moraski did not make any racial slurs. (*Id.*, ¶98.) Rather, Turner felt that Moraski was overstepping and showing him a different way to do his job than Moore had shown him. (*Id.*, ¶97.) Moraski was an experienced employee who Lakeside sometimes asked to provide guidance to new employees. (*Id.*, ¶61.) Moraski was also an employee who would get frustrated at times when the work was not done in a specific way, particularly if errors led to extra work. (*Id.*, ¶¶55, 170.) Moraski could be intense in those situations, not just with Turner. (*Id.*, ¶¶55, 113, 116, 122, 124.) During the alleged incident, Berndt moved Turner to a different work area, and there were no further interactions between Turner and Moraski that day. (*Id.*, ¶¶51, 101, 102.)

In fact, there were no other negative interactions between Moraski and Turner while Turner was assigned to Lakeside as a temporary employee, and no other negative interactions between Turner and anyone else. (*Id.*, ¶¶104-106.) According to Turner's own account, Turner normally did not work with Moraski and, with regard to the work environment in general, Turner stated that it "seemed somewhat like a family there." (*Id.*, ¶¶93, 105.) Indeed, there was not a hostile working environment present at Lakeside, let alone a hostile working environment tied to severe or pervasive racial harassment. Rather, at most, the evidence shows that Moraski was an intense

individual with co-workers at times, regardless of their race, when he felt that they were not performing their jobs correctly.

According to Moore, an African American employee who worked with Moraski and Turner, Moraski and Turner started off with a good working relationship. (*Id.*, ¶¶130, 137.) However, Moraski attempted to show Turner how to perform tasks and when Turner responded with what the Lead told him to do, it led to a falling out between them. (*Id.*, ¶137.) This is consistent with Moraski's statement that he provided to Lakeside, in which he stated that Turner did not want to listen to him on how to perform tasks. (*Id.*, ¶108.) Moraski also noted that Turner had come at him when he was alone stating that he was not going to listen to him on how to perform tasks and also made a comment that "you on the rag your acting like a bitch." (*Id.*, ¶¶108-109.) Notably, Moore never heard Moraski use racial language around him and never heard him use racial language about anyone. (*Id.*, ¶¶144, 149, 150.) Moore never felt uncomfortable working with Moraski and had even trained him. (*Id.*, ¶¶138, 150.) According to Moore, Lakeside does not tolerate discrimination; treats everyone equal and fair; has always been a great place; and Moore has never felt out of place. (*Id.*, ¶¶132-133.)

In considering the entire context of the workplace and the totality of the circumstances, the evidence shows that there was not an objectively hostile work environment and the alleged incidents did not unreasonably interfere with Turner's work performance. Indeed, the first alleged incident took place during a causal conversation between Moraski and Turner at a time when they had a good relationship and were getting to know each other. Turner did not believe that the racial slur was directed towards him. The second alleged incident took place outside of Lakeside's premises, and there is no evidence that there were consequences in the workplace. See, e.g. *Doe v. Oberweis Dairy*, 456 F.3d 704, 715 (7th Cir. 2006). The third alleged incident did not involve any

racial harassment and stemmed from a dispute regarding Moraski showing Turner how to perform a task. Therefore, the Court should grant summary judgment in favor of Lakeside.

In addition, to the extent that the EEOC's claim is considered further (it should not be), there is no basis for employer liability. An employer is liable for a hostile work environment created by an employee's coworkers only when the employee shows that his employer has "been negligent either in discovering or remedying the harassment." *Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000), citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir.1998). In addition, "notice or knowledge of the harassment is a prerequisite for liability." *Parkins*, 163 F.3d at 1035. "Generally, the law does not consider an employer to be apprised of the harassment 'unless the employee makes a concerted effort to inform the employer that a problem exists.'" *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004). "An employer is not liable for co-employee racial harassment 'when a mechanism to report the harassment exists, but the victim fails to utilize it.'" *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 549 (7th Cir. 2011).

In the instant case, the undisputed evidence shows that Turner did not report the alleged incidents to QPS until after he learned of the termination of his assignment at Lakeside. (Def. Prop. Material Facts, ¶¶103, 107.) This is true despite the fact that Turner had training on QPS' and Lakeside's discrimination and harassment policies and understood that if you witness anything or are going through anything, you should report it to your Lead and to QPS. (*Id.*, ¶¶7-11.) Turner also understood that he should report any concerns of harassment in the workplace immediately. (*Id.*, ¶11.) Because the undisputed facts show that Turner failed to report the alleged incidents to QPS—a mechanism that was clearly available to him—until after he learned of the termination of

his assignment at Lakeside, the Court should find as a matter of law that Lakeside cannot be held liable for the alleged co-employee racial harassment.

Even if the claim is considered further, the undisputed evidence shows that Turner did not make a concerted effort to inform Lakeside of racial harassment by a co-worker. Indeed, at the time of Lakeside's decision to separate with Turner, Lakeside was not aware of any information or claims of racial harassment or discrimination. (*Id.*, ¶42.) In addition, according to Berndt, Turner did not complain to him that Moraski was harassing him. (*Id.*, ¶¶166-167.) Berndt was aware that they were having a conflict and the working relationship between them was contentious. (*Id.*, ¶167.) Berndt had tried to mediate a dispute between Turner and Moraski about Turner not completing his work. (*Id.*, ¶168.) Berndt told Moraski to avoid Turner and stated that he would talk to Turner about Turner starting in on him that he was not going to listen to him because he was not a trainer. (*Id.*, ¶110.) According to Lor, Turner told Lor that he did not get along with Moraski and could not work with him; Lor then had them work in separate departments. (*Id.*, ¶¶162-163.)

Even construing the facts in the light most favorable to the EEOC, as the non-moving party, that Turner allegedly reported the first alleged incident to Lor and the second alleged incident to Berndt (despite Turner's own conflicting statements), the evidence still demonstrates that Turner did not make a concerted effort to inform Lakeside of racial harassment by a co-worker. Relatedly, the evidence does not support a finding that Lakeside was negligent in discovering or remedying the alleged harassment.

Turner initially stated that he did not report the first alleged incident to any Leads at Lakeside and believed the first incident to be different in nature than the second alleged incident. (*Id.*, ¶80.) Later, Turner stated that he reported to Lor that he had been threatened to go outside to

9

the parking lot by Moraski to fight and the racial slur. (*Id.*) Turner stated that Lor responded that he "did a good job" and to "keep focused" on his work. (*Id.*, ¶81.) Turner did not report the alleged incident to Scholl, Human Resources, or QPS. (*Id.*, ¶¶42, 67, 103.) Turner normally did not work with Moraski and Lor had them work in separate departments. (*Id.*, ¶¶93, 163.) There is no evidence that Turner experienced any other alleged incidents of racial harassment at the workplace. (*Id.*, ¶¶104-106.) Therefore, Lor's action of separating Moraski and Turner in separate departments promptly addressed the issue. Accordingly, no reasonable factfinder could conclude that Lakeside was negligent in discovering or remedying the alleged harassment. See *Paschall*, 28 F.4th at 813.

Moreover, according to Turner's account, he allegedly reported the second alleged incident to Berndt, after which Berndt did not ask any questions and did not respond, other than to assign him to where he would be working that day. (*Id.*, ¶¶91, 94.) Turner did not tell Berndt that he did not want to work around Moraski that day because Turner normally did not work with Moraski. (*Id.*, ¶93.) Despite the fact that Turner asserts Berndt did not acknowledge his report of alleged racial harassment off premises, Turner did not report the alleged incident to Scholl, Human Resources, or QPS. (*Id.*, ¶¶42, 67, 103.) Furthermore, although Turner claimed he reported the second alleged incident to the Oshkosh Police Department the same night that it occurred, there is no record of it. (*Id.*, ¶¶87-89.)

Later, when Moraski and Turner disagreed about Moraski showing Turner how to perform a task, Berndt moved Turner to a different work area and there were no further interactions between them. (*Id.*, ¶¶51, 101-102.) There is no evidence of any alleged racial harassment in the workplace following the second alleged incident that occurred off premises. (*Id.*, ¶¶98, 104.) Therefore, Berndt's assignment of work areas and communications with Moraski and Turner promptly

addressed the issue. Accordingly, no reasonable factfinder could conclude that Lakeside was negligent in discovering or remedying the alleged harassment. See *Paschall*, 28 F.4th at 813.

Even after Lakeside informed QPS that it would be separating with Turner, it is undisputed that QPS informed Lakeside of an altercation outside of work hours that Turner had recently reported, <u>without any reference to racial harassment or discrimination</u>. (*Id.*, ¶¶62-63.) QPS also asked Lakeside not to speak with Turner and told Turner not to contact Lakeside. (*Id.*, ¶¶63, 70.) Lakeside investigated the complaint of an altercation outside of work and determined that it was unsubstantiated. (*Id.*, ¶¶65-71.)

The facts of this case are akin to the facts in *Paschall* and require the same result. In *Paschall*, the defendant, Tube Processing Corporation, hired one of the plaintiffs, Paschall, a Black woman, through a temporary staffing agency to work as a machine operator. 28 F.4th at 809. Paschall worked for less than two (2) months. *Id.* Another employee, Benash, began training Paschall in her first few days on the job; Paschall complained to the first shift group leader, Combs, that she could not work with Benash because "he only wanted to talk about Mario Andretti and cars." *Id.* Even though the comments were distracting, Benash continued to train Paschall. *Id.* A few days later, Benash began making lewd comments, which Paschall also interpreted as racial in nature. *Id.* Paschall reported the comments to Combs, who assigned her to a different job for the remainder of the day. *Id.* The next day, Paschall was assigned to work near Benash again; however, he did not make any further inappropriate comments to her that day or on other days. *Id.* On one other occasion, Paschall overhead Benash tell others "ooh that n[**]ga be working fast" and Paschall believed that Benash was referring to her. *Id.* She reported it to Combs. *Id.*

Paschall eventually reported the incidents to the Assistant Vice President of Human Resources, Young. *Id.* Young responded that Benash was not at work due to an injury and she

11

would "deal with that issue when [Benash] comes back." *Id.* Young later wrote up Benash for "altercations or disagreements with co-workers" and instructed him to keep his "comments relevant to work and work related topics," and to not use "profane or provocative language around coworkers." *Id.* Young also warned Benash that if the conduct continued "further disciplinary actions could result." *Id.*

Paschall also experienced racial harassment related to another co-worker, Odom, a white woman. *Id.* 809-810. After Odom used a racial slur, Paschall reported the incident to Combs. *Id.* at 810. Combs reported this incident to Young and the Building Supervisor. *Id.* Young noted that Odom had a history of similar conduct, along with significant performance issues. *Id.* In addition, Young spoke with several employees. *Id.* Ultimately, Young issued a 3-day suspension to Odom. *Id.* After this, Paschall never heard Odom use the racial slur again. *Id.* Finally, Paschall asserted that she experienced other racism affecting her work environment, but she did not complain to Tube Processing Inc. about it. *Id.*

As to Paschall's sexual harassment claim, the Court held that Tube Processing Inc. was not negligent in discovering or remedying the alleged harassment by Paschall's co-worker, Benash. *Id.* at 813. The Court reasoned:

> After Benash made his lewd comments to Paschall, she immediately reported them to Combs. Combs then assigned Paschall to a different job for the rest of the day. *See Lapka*, 517 F.3d at 984 ("The emphasis is on the prevention of future harassment." (citing *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir.1996))). Paschall never reported Benash again for any sexual harassment, before or after Tube Processing reprimanded him.
>
> Simply put, after Tube Processing "receive[d] notice that some probability of sexual harassment exist[ed] ... [it] adequately respond[ed] to that information within a reasonable amount of time." *Erickson*, 469 F.3d at 606. No reasonable fact-finder could conclude that Tube Processing was negligent in preventing future harassment.

12

*Id.* at 813. Because this issue was dispositive, the Court did not decide whether a hostile environment existed. *Id.*

As to Paschall's claim of a racially hostile work environment based upon Benash and Odom's use of a racial slur, the Court again concluded that there was no basis for employer liability and did not resolve the issue of whether a hostile environment existed. *Id.* at 815. After Tube Processing Inc. reprimanded Benash and Odom, Paschall never heard the racial slur again. *Id.* In addition, as to the other plaintiff, a Black employee, the Court concluded that "[t]o be actionable, the harassing conduct would have had to be directed at him, and it was not." *Id.* Finally, as to their other assertions of a racially hostile environment, the Court held that they "fail to demonstrate a basis for employer liability because they did not report these matters to Tube Processing management or human resources." *Id.* at 816. There was also no evidence that Tube Processing Inc. was negligent in discovering or rectifying the issue. *Id.* Therefore, the Court granted summary judgment in favor of Tube Processing Inc. *Id.*

Like the facts in *Paschall* regarding Combs' response to Paschall's complaints about Benash, in the instant case, Lor and Berndt similarly assigned Turner to a different work area than Moraski, which was an effective remedy. Also, like the facts of *Paschall* in which Paschall did not experience any further incidents of sexual harassment after Combs assigned her to a different work area for the rest of the day, Turner similarly did not experience any further alleged incidents of racial harassment in the workplace following Lor's assignment of Turner and Moraski to separate work areas. In addition, Berndt separated Turner and Moraski in different parts of the building following their disagreement regarding training on stickering, and there were no further negative interactions between them.

Moreover, in *Paschall*, although Paschall reported hearing Benash's racial slur to Combs, it was Paschall who ultimately reported the racial slur involving Benash to Human Resources, which did not occur in this case. In the instant case, although Turner claims that he reported the first alleged incident to Lor (he initially said he did not) and the second alleged incident to Berndt (albeit that it was snowing and going into the winter season), he did not report the alleged incidents to Human Resources, QPS, or Scholl. This is also true despite the fact that Turner claims Berndt had no response to him. Indeed, there is no evidence that Berndt even heard Turner. Nevertheless, like *Paschall*, there were no other alleged incidents of racial harassment in the workplace following Turner's alleged reports to front line leaders. Thus, like in *Paschall*, no reasonable factfinder could conclude that Lakeside was negligent in preventing future harassment.

Therefore, even if the EEOC could show that the alleged harassment was so severe or pervasive so as to alter the conditions of the Turner's work environment by creating a hostile or abusive situation (it cannot), there is no basis for employer liability. Thus, summary judgment in favor of Lakeside is appropriate.

## II.   THE EEOC CANNOT PROVE THAT LAKESIDE DISCRIMINATED AGAINST TURNER BY TERMINATING HIS EMPLOYMENT ON THE BASIS OF HIS RACE.

To prove a claim of race discrimination under Title VII using the direct method of proof, the plaintiff must set forth "'sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action.'" *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 807 (7th Cir. 2017). In the instant case, the EEOC has not pled any facts to support a claim under the direct method of proof. Moreover, there is no evidence that Lakeside's decisionmakers were motivated by a discriminatory animus or that "a biased subordinate who lacks decision-making power use[d] the formal decision maker 'as a dupe in a

deliberate scheme to trigger a discriminatory employment action.'" See, e.g. *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013).

To prove a claim of race discrimination under Title VII using the indirect method of proof, "[t]he plaintiff carries the initial burden of establishing a prima facie case of discrimination, which can be accomplished by setting forth evidence that: '(1) [he] is a member of a protected class, (2) [his] job performance met [the employer's] legitimate expectations, (3) [he] suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *McKinney*, 866 F.3d at 807 (citation omitted). If these elements are established, the burden shifts to the employer to set forth a legitimate, non-discriminatory reason for its employment decision. *Id.*, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the employer does so, the burden shifts back to the plaintiff to present evidence that the employer's reason is a pretext for discrimination. *Id.*

The EEOC cannot prove that Turner's job performance met Lakeside's legitimate expectations. Lakeside terminated Turner's assignment at Lakeside due to poor attendance, work performance issues, inability to take direction, and inability to get along with others, including a threat to another employee. (*Id.* ¶¶43, 44) Berndt reported to Scholl that Turner was having trouble getting along with people; was sticking incorrectly; told him sarcastically "I love it when people treat me like a fucking idiot" and said he was going to walk out; and told Moraski that he was going to meet him outside. (*Id.*, ¶51.) In his note, Berndt was referring to Moraski having trouble training Turner how to sticker and when Berndt tried to train Turner how to sticker, Turner was belligerent. (*Id.*, 53.) Turner was not interested in taking direction from Berndt. (*Id.*) Berndt was concerned about Turner's ability to get along with other employees based upon the behavior that

15

he displayed to Berndt. (*Id.*, ¶54.) Leads do not have the authority to discipline or terminate employees. (*Id.*, ¶40.) Rather, the decision to terminate a temporary employee ultimately rests with Human Resources and the Division Supervisor. (*Id.*, ¶41.)

Based upon Berndt's note, Scholl made a recommendation to Leith to replace Turner. (*Id.*, ¶¶49, 50, 175.) Upon receiving this recommendation from Scholl, Leith also reviewed Turner's attendance record, which was unsatisfactory. (*Id.*, ¶¶45-47.) Indeed, it is common practice that if Human Resources receives a report of performance or productivity issues it will also look at the attendance of the temporary employee to make a decision on how the temporary employee is doing as a whole. (*Id.*, ¶36.) Temporary employees are held to a higher standard and placed under more scrutiny within their time at Lakeside. (*Id.*, ¶34.) Attendance and performance are extremely important. (*Id.*) If behavior or attendance is poor on the onset of a temporary employee's assignment, Lakeside has not seen that being high odds of improving later on, which is why decisions to separate are made early in the process. (*Id.*, ¶35.) Lakeside had a temp-to-hire agreement with QPS with a 60-day evaluation period. (*Id.*, ¶32.)

Turner was aware that attendance was "an essential function of the job" and that excellent attendance was a requirement of the Production Technician I position. (*Id.*, ¶¶6, 16.) Turner was also aware that if he would be late, needed to leave early, or would miss work entirely for any reason, he needed to call QPS and Lakeside. (*Id.*, ¶¶6, 17-19.) QPS explained to Turner that there were consequences if he violated QPS' attendance policy. (*Id.*, ¶18.) QPS' attendance policy applied to temporary employees and Lakeside's attendance policy was also used as a guideline for temporary employees. (*Id.*, ¶28.) Turner understood that excellent attendance was a reasonable expectation. (*Id.*, ¶16.) On June 7, 2019, which was Turner's second day of work, Turner was 5 minutes late. (*Id.*, ¶58.) On June 9, 2019, Turner punched in at 7:02 A.M. and abruptly left work

at 7:12 A.M., without informing Lakeside. (*Id.*, ¶59.) On June 28, 2019, Turner did not show up for work at Lakeside and did not report it to Lakeside. (*Id.*, ¶60.) Lakeside determined that Turner's attendance in his short period of time with Lakeside was not satisfactory. (*Id.*, ¶47.)

In addition, Turner was aware of the responsibilities of the position and agreed that they were reasonable. Turner was aware of his responsibility to "ensure that the products meet quality control standards" and understood that to be a reasonable expectation. (*Id.*, ¶12.) In addition, he was aware of his responsibility to "[p]lace SKU stickers on cones according to specification" and understood that to be a reasonable expectation. (*Id.*, ¶13.) Also, Turner was aware of his responsibility to "[f]ollow direction of leads and division supervisor and perform work as assigned" and understood that to be a reasonable expectation. (*Id.*, ¶14.)

Despite Turner's knowledge of the position requirements and his belief that the expectations were reasonable, Turner had performance issues related to stickering, was not interested in taking direction from Berndt on how to perform the job, and acted belligerent towards Berndt. (*Id.*, ¶¶43, 44, 51, 53.) Indeed, Turner admits that he told Berndt, "I feel like you're all trying to play me like a fucking idiot." (*Id.*, ¶¶51, 101.) Turner also demonstrated an inability to get along with others, including that Moraski and Berndt had trouble training Turner how to sticker, and based upon the behavior that Turner displayed towards Berndt, Berndt was concerned about Turner's ability to get along with other employees. (*Id.*, ¶¶51, 53-54.) Notably, Moore also observed that Moraski and Turner had some disagreements that stemmed from Moraski attempting to show Turner how to perform tasks. (*Id.*, ¶¶136-137.) Berndt also reported in his note that Turner told Moraski that he was going to meet him outside. (*Id.*, ¶51.) Therefore, the EEOC cannot show that Turner's job performance met Lakeside's legitimate expectations. Accordingly, the Court should grant summary judgment in favor of Lakeside.

Even if the claim is considered further (it should not be), the EEOC also cannot show that another similarly situated employee who was not in the protected class was treated more favorably than Turner. The evidence in this case overwhelmingly establishes that it was Turner's poor attendance, work performance issues, inability to take direction, and inability to get along with others, over a short period of time, that formed the basis for Lakeside's decision to terminate his assignment with Lakeside. (*Id.*, ¶¶43, 44, 47, 56.) There is no evidence of a similarly situated employee outside of Turner's protected class who was treated more favorably and also demonstrated poor attendance, work performance issues, inability to take direction, and inability to get along with others, over a short period of time. See *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014) ("A similarly situated employee is one whose performance, qualifications, and conduct are comparable in all material respects); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) ("An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.")

Moreover, temporary employees who have been hired directly by Lakeside after the 60-day evaluation period are not comparable. If behavior or attendance is poor on the onset of a temporary employee's assignment, Lakeside has not seen that being high odds of improving later on. (*Id.*, ¶35.) Due to the volume of temporary employees at Lakeside, Lakeside needs to make decisions on a temporary employees' performance, which includes productivity, attendance, behavior, conduct, and ability to get along with others, early in the process. (*Id.*, ¶33.) Discipline for temporary employees happens on an expedited basis. (*Id.*)

18

Because the EEOC cannot meet its initial burden of establishing a prima facie case of discrimination, the burden does not shift to Lakeside to set forth a legitimate, non-discriminatory reason for its employment decision. However, if considered by the Court, the evidence overwhelmingly demonstrates that Lakeside had multiple legitimate, non-discriminatory reasons for its decision to terminate Turner's assignment at Lakeside, none of which had anything to do with Turner's race. In short, there is no evidence that race was a motivating factor in Lakeside's decision. Furthermore, there is no evidence that Lakeside's legitimate non-discriminatory reasons are a pretext for discrimination and, since the EEOC cannot establish a prima facie case of employment discrimination, Lakeside may not be subjected to a pretext inquiry. See *Widmar*, 772 F.3d at 463. Therefore, summary judgment in favor of Lakeside is appropriate. See *LaRiviere v. Bd. of Trustees of S. Illinois Univ.*, 926 F.3d 356, 360 (7th Cir. 2019) (holding that "[a]n employee can't sue under Title VII for employment-related mistreatment, however, unless the mistreatment was related to membership in a protected class.")

### III. THE EEOC CANNOT PROVE THAT LAKESIDE TERMINATED TURNER'S ASSIGNMENT WITH LAKESIDE IN RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY OR DUE TO HIS RACE AND ENGAGING IN PROTECTED ACTIVITY.

To establish a Title VII retaliation claim under the direct method of proof, the EEOC must present evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Milligan v. Bd. of Trustees of S. Illinois Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). Under the third element, causation can be shown at the summary judgment stage if the employee's complaints "were a substantial or motivating factor" in the employer's decision. *Id.* at 388.

To establish a Title VII retaliation claim under the indirect method of proof, the EEOC must present evidence that: "(1) he engaged in a statutorily protected activity; (2) he met his

employer's legitimate expectations, i.e., he was performing his job satisfactorily; (3) he suffered a materially adverse action; and (4) he was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity." *Harper v. C.R. England, Inc*., 687 F.3d 297, 309 (7th Cir. 2012). If the EEOC establishes a prima facie case, then the burden shifts to Lakeside to articulate a non-discriminatory reason for discharging Turner. *Id.* If Lakeside meets its burden, then the burden shifts back to the EEOC to show that a genuine issue of material fact exists as to whether Lakeside's proffered reason was pretextual. *Id.*

The EEOC cannot show that Turner engaged in a statutorily protected activity under either method of proof. Indeed, at the time of Lakeside's decision to separate with Turner, Lakeside was not aware of any information or claims of racial harassment or discrimination. (*Id.*, ¶¶42, 62-63.) In addition, it is undisputed that Turner did not report his claims to QPS until after QPS communicated that Lakeside was terminating his assignment. (*Id.*, ¶¶103, 107.) According to Berndt, Turner did not complain to Berndt that Moraski was harassing him. (*Id.*, ¶167.) Berndt was aware that they were having a conflict and the working relationship between them was contentious. (*Id.*) Berndt had tried to mediate a dispute between Turner and Moraski about Turner not completing his work. (*Id.*, ¶168.) Berndt told Moraski to avoid Turner and stated that he would talk to Turner about Turner starting in on him that he was not going to listen to him because he was not a trainer. (*Id.*, ¶110.) According to Lor, Turner told Lor that he did not get along with Moraski and could not work with him. (*Id.*, ¶¶162.) Lor then had them work in separate departments. (*Id.*, ¶163.) Therefore, the evidence does not support that Turner engaged in any statutorily protected activity.

Even construing the facts in the light most favorable to the EEOC, as the non-moving party, that Turner reported the first alleged incident to Lor and the second alleged incident to Berndt

(despite Turner's own conflicting statements), it does not rise to the level of statutorily protected activity. "An employee engages in a protected activity by either: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). Complaints that are "[v]ague and obscure" do not constitute protected activity, nor do complaints regarding personal conflicts unrelated to a protected characteristic. *Id.*

Moreover, even if Turner's alleged reports to Lor and Berndt constitute statutorily protected activity (they do not), the EEOC cannot establish causation under the direct method of proof. There is no evidence that Turner's complaints were a substantial or motivating factor in Lakeside's decision to terminate Turner's assignment with Lakeside. Indeed, there is no evidence that the decisionmakers at Lakeside—and those with authority to terminate Turner's assignment— had any knowledge of Turner's alleged complaints. (*Id.*, ¶¶42, 67.) Rather, the evidence overwhelmingly establishes that it was Turner's poor attendance, work performance issues, inability to take direction, and inability to get along with others, over a short period of time, that formed the basis for Lakeside's decision to terminate his assignment with Lakeside. (*Id.*, ¶¶43-47.) Therefore, the EEOC cannot show causation under the direct method of proof.

Even if Turner's alleged reports to Lor and Berndt constitute statutorily protected activity (they do not), the EEOC cannot establish under the indirect method of proof that Turner was meeting Lakeside's legitimate expectations. As set forth above, the evidence leads to only one reasonable conclusion: Turner was not meeting Lakeside's reasonable expectations. Turner knew what the expectations were, agreed that they were reasonable, and failed to follow them. Therefore,

the EEOC cannot meet this required element of its claim of retaliation under the indirect method of proof.

Furthermore, as set forth above, the EEOC cannot establish under the indirect method of proof that Turner was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity. Adams is not comparable to Turner because Lakeside's decisionmakers were not even aware of Turner's claims of racial harassment and discrimination when they made the decision to terminate his assignment with Lakeside. (*Id.*, ¶42.) Moreover, upon learning of the information from Moore in the context of investigating Adams' complaint, Leith followed up with QPS indicating that there were reports that the person Turner was talking about was threatening other individuals at Lakeside as well, and that one of the employees stated they saw Moraski following Turner one day and threatening Turner. (*Id.*, ¶¶119, 121, 125.) Leith apologized and stated that Moraski was no longer with Lakeside. (*Id.*, ¶126.) QPS asked Leith if Turner would be eligible to return if he wants to return, and Leith said to let her know and she would follow up with his supervisor. (*Id.*, ¶127.) Leith did not hear anything back from QPS about whether Turner wanted to return to Lakeside. (*Id.*, ¶182.)

In addition, the EEOC's claim that Adams is a comparator would ultimately fail for the same reasons as set forth above, because there is no evidence that Adams had poor attendance, work performance issues, inability to take direction, and inability to get along with others, including a threat to another employee. Therefore, the EEOC cannot meet this required element of its claim of retaliation under the indirect method of proof, in addition to the other elements.

Finally, there is no evidence to establish a claim of termination based upon the intersection of race and engaging in protected activity, and the EEOC has not pled facts to support such a claim. The EEOC has described "intersectional discrimination" claims as follows:

Title VII prohibits discrimination not just because of one protected trait (e.g., race), but also because of the intersection of two or more protected bases (e.g., race and sex). For example, Title VII prohibits discrimination against African American women even if the employer does not discriminate against White women or African American men. Likewise, Title VII protects Asian American women from discrimination based on stereotypes and assumptions about them "even in the absence of discrimination against Asian American men or White women." The law also prohibits individuals from being subjected to discrimination because of the intersection of their race and a trait covered by another EEO statute – e.g., race and disability, or race and age.

EEOC Compliance Manual, Section 15, at https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination (last visited January 24, 2024). In addition, the EEOC has described "race plus" claims as follows: "Title VII prohibits discrimination against a subgroup of persons in a racial group because they have certain attributes in addition to their race. Thus, for example, it would violate Title VII for an employer to reject Black women with preschool age children, while not rejecting other women with preschool age children." *Id.* The EEOC has not pled any facts to support an "intersectional discrimination" or "race plus" claim in this case. Furthermore, as set forth above, the EEOC cannot prove its claim of race discrimination or its claim of retaliation.

## **CONCLUSION**

Based upon the foregoing, Lakeside respectfully requests that the Court grant summary judgment in favor of Lakeside as to all of the EEOC's claims and dismiss the EEOC's complaint.

Dated this 1st day of February, 2024.

RENNING, LEWIS & LACY, S.C, Attorneys for Plaintiff, Lakeside Plastics

s/Jenna E. Rousseau
Tony J. Renning
State Bar No. 1041465
Jenna E. Rousseau
State Bar No. 1065236

P.O. Address
Attorney Tony J. Renning
Renning, Lewis & Lacy, s.c.
43 W. 6th Avenue
Oshkosh, WI 54902
920-420-7527
trenning@law-rll.com

Attorney Jenna E. Rousseau
Renning, Lewis & Lacy, s.c.
205 Doty Street, Suite 201
Green Bay, WI 54301
920-283-0708
jrousseau@law-rll.com