UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| | ) | Case No. 1:22-cv-01149-WCG |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **PLAINTIFF EEOC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S** |
| LAKESIDE PLASTICS, INC., | ) ) | **MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | ) ) ) | |

## I.    INTRODUCTION

The Equal Employment Opportunity Commission ("EEOC") submits this memorandum in opposition to Defendant Lakeside Plastics, Inc.'s ("Defendant" or "Lakeside") Motion for Summary Judgment and argues that the Court should deny summary judgment as the EEOC can prove its racial harassment, termination, and retaliation claims. There is sufficient evidence for a reasonable jury to find that Defendant discriminated against Brian Turner ("Turner") by subjecting him to a hostile work environment based on his race, Black. Defendant knew or should have known that a White coworker called Turner racial slurs and threatened him with racial violence, but Defendant failed to take appropriate action to stop or prevent it. The evidence also supports that Defendant terminated Turner because of his race, and its proffered reasons are not credible, but pretext for discrimination. There also is sufficient evidence that Defendant terminated Turner for engaging in protected activity when he opposed the harassment.

## II.    STATEMENT OF FACTS[1]

### A.    Turner was Subjected to Racial Harassment and Defendant Did Not Take Reasonable Steps to Discover or Remedy the Harassment.

---

[1]  The EEOC adopts and incorporates by reference Plaintiff EEOC's Statement of Additional Facts which is cited in this memorandum as EEOC followed by the numbered paragraph.

Brian Turner was employed with the temporary staffing firm QPS Employment Group ("QPS") which placed him to work at Lakeside on June 6, 2019. (EEOC ¶1) Turner worked as a production technician on the first shift weekends, Thursday – Sunday, from 7 am to 3 pm. (*Id.*) Turner was supervised by Leads Max Berndt and Japan Lor. (EEOC ¶2) Scott Scholl was the division supervisor and did not work directly with the production technicians. (*Id.*) Leads supervised the production technicians. (*Id.*) If a production employee had an issue, he should report it to his Lead. (*Id.*) Leads could recommend employees be terminated. (EEOC ¶3)

Curt Moraski, who is White, was a production technician. He was not a trainer or Lead. (EEOC ¶4) Turner rode his bike to work. About the second day of work, he met Moraski who gave Turner a ride home at least twice during the first week. (EEOC ¶5) But, either the second or third week[2] while working together, Moraski told Turner he was from Milwaukee, the same city as Turner, and Moraski said he used to knock "niggers" out on the south side of Milwaukee. (EEOC ¶6) Turner told Moraski that he did not care for that type of conversation, and Moraski responded that they could go out to the parking lot. Turner told Moraski he did not have time for his conduct and kept his distance from Moraski. (EEOC ¶6) Turner reported the harassment to Lor, telling him that Moraski said he used to knock "niggers" out on the southside of Milwaukee, and Moraski threatened him to go to the parking lot to fight. (EEOC ¶8)[3] Lor told him he was doing a good job and to go back to work. Lor did not take notes or ask any questions. (*Id.*)

_____

[2] Turner worked at Lakeside from June 6 to June 30, 2019. He had difficulty recalling the dates of the harassment but believes the first incident occurred either his second or third workweek, which would have been either June 13 – June 16 or June 20 to June 23, 2019. (EEOC ¶7)

[3] Defendant attacks Turner's credibility arguing that he made conflicting statements such as the harassment occurred in the winter, and he first did not recall whether he reported this incident to a lead. (Doc. 23, pp. 6, 9) Defendant's arguments regarding credibility should be disregarded because at summary judgment, a court does not make credibility determinations. *See Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006).

Lor admits Turner complained to him that he did not get along with Moraski and could not work with him. (EEOC ¶9) Lor did not ask Turner why he could not work with Moraski, and he did not talk to Moraski. (*Id*.) Also, Keith Moore, who is Black, complained to Lor that he could not work with Moraski. (EEOC ¶10) Lor did not tell Scholl or Human Resources about Turner's or Moore's complaints. (*Id*.) Lor never spoke to Scholl or Leith about Turner. (*Id.*)

Moraski escalated the harassment the fourth week of Turner's employment, on June 29, 2019, Turner said after work while he was biking home, he took a different route to avoid Moraski, but they ended up at the same intersection. Turner turned right, and where Moraski would normally turn left, instead, he followed Turner. (EEOC ¶11) Turner looked back when he heard Moraski's truck, and Moraski pulled beside Turner who was on his bike. (*Id*.) Moraski followed Turner and yelled at Turner to get off his bike so they could fight. Turner refused so Moraski threatened to hit Turner off his bike. Turner said "…it made me feel then, like my life was in danger." (*Id*.) Turner stopped his bike, and Moraski yelled out the window that he was going to knock his "nigger ass out." Moraski threatened Turner saying, "I'm going to hang your nigger ass. Turner told Moraski he did not have time for his conduct, and Moraski pulled off. (*Id.*) Turner crossed the street, but Moraski made a U-turn, drove back to Turner and again threatened him, saying he was going to fight Turner, knock his "nigger ass out" and "hang his nigger ass." (*Id.*) Turner kept riding his bike to get away from Moraski. "My main thing was just – human nature, fight or flight. It was the flight. Get out of the situation. It was me on the bike versus a truck." (*Id.*) Moraski drove off and Turner biked home. Turner said, "I feared for my house and my life because he dropped me off twice, so I didn't know if he was going to come to my house and try to do something to me or my family." (*Id*.)

The next day at work, June 30, 2019, Turner told Moore about the harassment, and that

he did not feel safe. (EEOC ¶12) Moore witnessed Moraski following Turner. Moore said

Moraski veered his truck off to the side of the road near Turner and Moraski was shouting out

the window. Moore did not stay at the scene. (*Id.*) Moore stated, "Brian said he feared for his life

when he told me the next day." (*Id.*) Moore worried the incident could turn violent. "… And I'm

like, wow, I just hope he don't run the guy, poor guy over with his truck and he's on the bike."

(*Id.*) Moore said Turner told him that Moraski called him the N-word and wanted to fight him.

(*Id.*) Moore said Turner was shaken by the incident and he told him to report the harassment.

(*Id.*) Moore later reported the harassment to Lor, Scholl and Leith. (*Id.*)

Turner reported the harassment to Berndt. Turner told Berndt that Moraski pulled next to

him in his truck while he was biking home, and Moraski said he was going to "hang my nigger

ass, knock my nigger ass out, and how he gonna hit me with his truck." Turner told Berndt he

feared for his life, and he did not want to work with Moraski. (EEOC ¶13) Berndt did not take

notes or ask questions; Berndt was only concerned with assigning Turner to work. (*Id.*) Turner

worked one station, but then Defendant moved him to a different area to label boxes. (EEOC

¶14) Moraski sought out Turner and told him that he was the boss, and Turner had to listen to

him. Turner told him that Moore already showed him what to do, and that Moraski was not his

boss. (*Id.*) Turner felt Moraski tried to "overpower" him. (*Id.*) Turner told Moraski he was going

to complain to Berndt, and Moraski replied that Berndt would not believe Turner, but would

believe him (Moraski). (*Id.*) Turner did not feel safe working with Moraski and again

complained to Berndt who told him to go back to work. Turner became upset and told Berndt

that he was forcing him to work with "somebody who sit here and threaten my life and make me

feel unsafe here. I feel like y'all are trying to play me, y'all are trying to play me like I'm dumb,

just – I feel like you're all trying to play me like a fucking idiot and I'm about to call QPS."

(EEOC ¶15) When Turner threatened to call QPS, Berndt told him not to do that and moved him to a different workstation. (*Id*.)

**B. Lakeside Terminated Turner's Employment.**

**1. Berndt recommended that Lakeside terminate Turner because of a disagreement with Moraski; Supervisor and HR approved the termination.**

Berndt claims on June 29, 2019, he observed Turner putting SKU stickers unsatisfactorily on construction cones, and this caused a conflict between Turner and Moraski. (EEOC ¶16) Berndt admits other employees also put SKU stickers on the cones incorrectly, and this was something that happened with new employees. (*Id*.) He said this only happened on this one occasion with Turner. (*Id*.) Berndt said Turner and Moraski were both frustrated, but they were not arguing or yelling. (EEOC ¶17) Berndt claims he tried to train Turner on stickering, but instead of taking instruction, Turner had a lack of interest. (*Id*.) Berndt did not work with Turner before this incident or have any other conflict with him. (*Id*.) Berndt did not recall performance problems with Turner other than this incident with Moraski. (*Id*.) Berndt claims he separated them to different departments, Turner calmed down and there were no further incidents. (*Id*.)

Based on this disagreement between Turner and Moraski, Berndt wrote a note to Scholl recommending that Turner be terminated. (EEOC ¶18) In the note, Berndt claims the next day June 30, 2019, Turner told Moraski he was going to "meet him outside." (*Id*.) However, at his deposition Berndt could not remember what the comment "meet him outside" was about, and he thought the incidents occurred all in one day, but he wrote it as two days in the note so "I'm not confident I can answer correctly." (*Id*.) Berndt does not recall if he heard Turner tell Moraski to "meet him outside" or if that was something Moraski told him. (*Id*.) Berndt also wrote, "You may want to replace him, I don't think he's gonna be able to get along with some of the guys around here." (*Id*.) Berndt did not think Turner could get along with Moraski. He did not recall

anyone else Turner could not get along with. (EEOC ¶19) Berndt described Moraski as a rough individual who was abrasive and had no sense of decorum. (*Id*.) Berndt said Moraski wanted things his way and would get frustrated. Berndt admits Moraski got frustrated with him. (*Id*.) Berndt said Moraski was "not great culturally for the environment of the working area," and "He just rubbed people the wrong way, and it could get kind of toxic." (*Id*.)

Other employees had difficulty getting along with Moraski. Alex Adams said Moraski threatened to fight him. (EEOC ¶20) Adams said Moraski called Moore "A piece of shit and then he call him the N-word." (*Id*.) Adams, who is White, said Moraski was a racist because of the way Moraski interacted with Black employees. (*Id*.) Moore had difficulty training Moraski. (*Id.*) Moore said Moraski tried to "one up" on Turner, telling him what to do. (*Id*.) Moore said Moraski was "cocky" and looked at him in an intimidating way. (*Id*.) Defendant documented Moraski's negative conduct in employee evaluations. On June 27, 2019, Defendant wrote Moraski needs to work on speaking to others in a respectful manner. (EEOC ¶21) Scholl admits the June 27, 2019 evaluation was conducted prior to Turner's termination.

Despite Defendant being aware that Moraski was "toxic," Defendant terminated Turner on July 1, 2019. (EEOC ¶22) Turner said Defendant ignored his racial harassment complaints and terminated him because of his race. (EEOC ¶23) Kelly Leith, Human Resources Director, said she and Scholl made the decision. (EEOC ¶24) Leith claims she talked to Scholl about the decision to terminate Turner but did not have any documentation of this conversation. (*Id.*) Scholl said it was HR's decision, and he only suggested termination by forwarding Berndt's note to Leith. (EEOC ¶25) Scholl said his recommendation was based on Berndt's note, and the note was the only documentation he reviewed. (*Id*.) Scholl did not talk to Leith. Scholl said Leith did not contact him or investigate why he wanted Turner fired. Scholl did not talk to Berndt, stating

"I accepted the note and forwarded it to HR." Scholl always accepts a termination recommendation from the Lead. He does not conduct an investigation. (*Id.*)

## 2. **Defendant's asserted reasons for Turner's termination**.

Defendant claims it fired Turner for poor attendance, work performance, inability to take direction, inability to get along with others, and a threat to an employee. Turner never received any discipline at Lakeside. (EEOC ¶26) Berndt did not recommend terminating Turner for attendance. (EEOC ¶27) Berndt did not recall any issue with Turner's attendance, and he did not look at Turner's attendance records. (*Id.*) Berndt has never recommended that someone be fired because they were five minutes late. (*Id.*) Scholl did not review Turner's attendance records or recommend Turner be fired for poor attendance. Scholl did not know anything about Turner's attendance, and Berndt's note did not mention poor attendance. (EEOC ¶28) Lor said Turner was late one time and absent one time. (EEOC ¶29). Lor said employees are not terminated for being late, and they are not terminated for one absence. (*Id.*)

Defendant's attendance records do not show Turner had poor attendance. According to the records (date and time punched in): 6/6 at 7 am; 6/7 at 7:05 am; 6/8 at 7 am; 6/9 at 7:02 am; 6/13 at 6:55 am; 6/14 at 6:58 pm; 6/15 at 6:56 am; 6/16 at 6:58 am; 6/20 at 6:55 am; 6/21 at 6:55 am; 6/22 at 7:07 am; 6/23 at 6:57 am; 6/27 at 6:56 am; 6/28 absent; 6/29 at 6:55 am. (EEOC ¶30) Leith admits that based on Defendant's records Turner was either on time or early more days than he was late, and this was not poor attendance to warrant termination. (EEOC ¶31) Leith claims she reviewed Turner's attendance records at the time Lakeside fired him. She said nobody told her to do so, then said she did not recall who told her to do it, then said perhaps Scholl or herself. Leith claims she discussed Turner's attendance with Scholl. (EEOC ¶32) Leith claims she followed QPS's attendance policy with Lakeside's policy as a guide but did not have any

evidence to support that she reviewed QPS's policy at the time Lakeside fired Turner. (*Id*.) Leith did not tell Turner he had poor attendance and does not know if anyone else did. (*Id*.) Turner was not counseled, coached or disciplined about attendance. (EEOC ¶33) Turner called QPS on June 28 to report that he was going to be absent and QPS informed Lakeside. (*Id*.)

Berndt's note was Defendant's only evidence of Turner's alleged poor performance and inability to get along with coworkers. (EEOC ¶100) Turner was a good worker. Moore, who was a trainer, said Turner was a good worker who did his job and showed up on time. Moore said Turner worked well with him. (EEOC ¶34) Moore is not aware of anyone being fired for making a mistake with stickering. (*Id*.) Lor did not recall any problems with Turner or his work. (EEOC ¶35) Except for the stickering, Berndt did not have any issues with Turner's work performance. (EEOC ¶36) Scholl did not interact with Turner nor did he observe Turner's work. (EEOC ¶37) Scholl had no first-hand knowledge about the stickering issue, and information about Turner's performance was based on Berndt's note. (*Id*.) Scholl said an employee should not be fired for stickering incorrectly. (*Id*.) Leith said Moraski had no authority to tell Turner how to do his job because Moraski was not a lead or supervisor. (EEOC ¶38)

The only employee Turner did not get along with was Moraski. (EEOC ¶39) Leith never talked to Turner about Defendant's claim that he could not get along with coworkers. (EEOC ¶40) Berndt admits it was possible that Turner did not get along with Moraski because Moraski called him racial slurs and threatened him. (EEOC ¶41) Berndt admits it is possible that he (Berndt) was condescending and not respectful which escalated the incident with Turner. (EEOC ¶42) Berndt acknowledge that his own social skills were a weakness and he focused on getting the work done not connecting with people. (*Id.*) Berndt admits he was not always calm and patient with new employees, and not friendly to new temps. (*Id.*) Berndt had issues being

respectful. (*Id.*) Scholl wrote in Berndt's evaluations that he needs to work on talking to employees without being condescending and being respectful. (EEOC ¶43) Berndt could have suggested a verbal or written warning instead of termination. (EEOC ¶44) Scholl said if Moraski harassed Turner, it would be reasonable for Turner to not get along with Moraski. (EEOC ¶45)

Turner denies threatening Moraski or telling Moraski to meet him outside. (EEOC ¶46) Berndt admits he did not know if Moraski's allegation that Turner threatened him was true. (EEOC ¶47) Berndt did not specifically write in the note to Scholl that Turner said he was going to meet Moraski outside to fight. (*Id.*) Berndt did not recall if he heard Turner say to Moraski "meet me outside" or if Moraski told him it happened. (*Id.*) Scholl did not know if Turner told Moraski to meet him outside or what "meet him outside" was about. (EEOC ¶48) Scholl knew Moraski had a problem telling people what to do and being disrespectful. Scholl admits if he would have looked at Moraski's evaluations this may have changed his decision to terminate Turner because of the disagreement with Moraski. (EEOC ¶49) Scholl then changed his testimony and claimed he fired Turner because Turner threatened Moraski. (*Id.*) Scholl admits he had no evidence that Turner threatened Moraski, and neither he nor HR investigated it. (*Id.*)

### 3. QPS reported Turner's harassment complaint to Lakeside; initially Lakeside denied it, but later confirmed it was true, but failed to rehire Turner.

On July 1, 2019, when QPS informed Turner that Lakeside terminated him, Turner reported the racial harassment to QPS. (EEOC ¶50) QPS Senior Recruiter Sarah Hershberger documented Turner's complaint, and QPS informed Lakeside. (EEOC ¶51) Leith admits that QPS reported Turner's race discrimination and harassment complaints to her on July 1, 2019. (EEOC ¶52) Leith said QPS told her the harasser was Moraski, and Moraski threatened to fight Turner; Moraski drove next to Turner and threatened to "beat his nigger ass;" Moraski called Turner "nigger;" and Turner complained to his supervisors who ignored him. (*Id.*) Leith admits

that Moraski's conduct violated Lakeside's harassment policy. (EEOC ¶53) After receiving the complaint from QPS, Leith claims she had separate, face-to-face conversations with Scholl, Berndt, Lor and Moraski, but did not take any notes. (EEOC ¶54) Leith claims Scholl, Berndt and Lor did not have information about the harassment. Leith did not recall if she told Berndt and Lor about Turner's allegations. (*Id.*) Leith got a statement from Moraski. (*Id.*) Leith admits that Moraski's statement did not address Turner's harassment claim, and if Moraski was going to deny the harassment, he would have written it in his statement. Leith did not know why she believed that Moraski did not harass Turner. (*Id.*) Leith did not ask anyone else to write statements. (*Id.*) She did not talk to any employees who worked with Turner and Moraski including Moore and Adams. (*Id.*) Leith did not write an investigation report, and she did not review documents or harassment or discrimination law. (*Id.*) Leith concluded there was no report of it occurring, but admits the harassment could have occurred, but was not reported. (*Id.*)

Scholl denies talking to Leith and did not recall Leith or anyone investigating Turner's harassment complaint. (EEOC ¶55) Scholl did not know about the complaint in 2019 but, learned about it during the EEOC investigation. (*Id.*) Scholl did not talk to Lor or any employees about Turner. (*Id.*) He did not talk to Berndt until the EEOC investigation. (*Id.*) Berndt first learned about Turner's complaint from Leith during the EEOC's investigation when he was interviewed by the EEOC. Scholl and Berndt were interviewed by the EEOC on December 7, 2021, two years after Leith claims she talked to them. (EEOC ¶56) Lor never spoke to Leith about Turner. (EEOC ¶57) Leith told QPS that Turner made up the claim. (EEOC ¶58)

However, on August 1, 2019, Leith contacted QPS, apologized and told them that Turner's complaint about Moraski was accurate. (EEOC ¶59) Leith learned that Moraski harassed Turner when she investigated a claim from Adams about Moraski. (*Id.*) In her

investigation of Adams' claim, Leith interviewed Moore who told her he saw Moraski follow and threaten Turner. (*Id*.) Leith did not interview Moore on July 1, 2019, when Turner complained of harassment to QPS. (*Id*.) Defendant terminated Moraski based on Adams' claim. Moraski's behavior had been addressed in his annual review in July 2019 regarding how he communicated with coworkers. (EEOC ¶60) Leith wrote that Moraski did not follow reporting procedures of informing the lead with work problems and was taking it upon himself to correct employees and often became loud and intimidating. (*Id*.) Leith admits that Moraski's conduct with Adams was one of the same issues that Turner complained about. (EEOC ¶61) Lakeside was aware of Moraski's intimidating conduct prior to Turner's termination. (EEOC ¶62) Defendant knew Turner's complaint was true but did not rehire him. (EEOC ¶63)

    **C.  Defendant's Policies, Procedures and Training.**

    Lakeside's employee handbook and polices apply to permanent and temporary employees. (EEOC ¶64) The handbook dated May 1, 2015, was in place in 2019. (EEOC ¶65) The handbook is discussed by human resources with permanent employees on their first day of work at orientation, and by the staffing firm with temporary employees. (EEOC ¶66) The "Policy Against Unlawful Harassment & Discrimination" includes race discrimination. (EEOC ¶67) Examples of harassment include verbal or physical conduct that creates an intimidating, hostile or offensive working environment; unprofessional comments with respect to an individual's race; insults or name-calling based on race; jokes or other remarks that are demeaning to an individual's race; and physical, verbal or psychological abuse based on an individual's race. (*Id.*) Lakeside claims it has zero tolerance for harassment or discrimination. (EEOC ¶68)

    Lakeside admits that racial slurs, threatening violence or threatening to assault an employee based on race, calling a Black employee "nigger," and threatening a Black employee

to beat his "nigger ass" are all violations of Lakeside's policy and Title VII. (EEOC ¶69) Lakeside agrees that if an employee is called a racial slur, this could create an intimidating, hostile and offensive environment and could unreasonably interfere with his work performance. (EEOC ¶70) Lakeside also agrees that if an employee is threatened with violence, it could create an intimidating, hostile and offensive environment, and interfere with his work performance. (EEOC ¶71) Leith, Scholl, Berndt and Lor agree that racial slurs, negative comments based on race and threatening someone with violence based on race violates Lakeside's policy. (EEOC ¶72) The policy states harassment should be reported to the worker's supervisor or Human Resources. (EEOC ¶73) If a temporary employee believes they have been harassed, they should report the harassment to a supervisor, manager of Human Resources or to a QPS consultant. (EEOC ¶74) Leads must report harassment to their supervisor and human resources. Supervisors must report harassment to human resources. Leads and supervisors should take notes and provide the information to human resources. (EEOC ¶75) Scholl said he did not have any training on investigating, documenting or interviewing witnesses regarding racial harassment. (EEOC ¶76)

Lakeside claims it will promptly and impartially initiate an investigation of discrimination and/or harassment. Lakeside claims it prohibits retaliation against an employee who reports discrimination or harassment. (EEOC ¶77) Human Resources is supposed to gather data through witness statements and interviews and make a determination on discipline in partnership with the division supervisor. (EEOC ¶78) Human Resources should interview Leads, supervisors, and employees who worked with the employee who is harassed and the harasser. Human Resources should document the steps that were taken in an investigation and make a written summary. (*Id.*)

For Turner's complaint, Lakeside said the best practice would have been to talk to

everyone who worked first shift cones. (EEOC ¶79) Lakeside admits that if Moore would have been interviewed on July 1, 2019, when it learned about Turner's complaint from QPS, it would have known about the harassment. (*Id.*) If a temporary employee is harassed or subjected to discrimination, Lakeside has a responsibility to address it. (EEOC ¶80) Lakeside has a responsibility to ensure that discrimination and harassment does not occur in its workplace. (*Id.*) If human resources receives a complaint that two employees are not getting along then human resources should discuss the unlawful harassment and discrimination policy with both employees, examine the situation, conduct an investigation or get witness statements to understand the nature of the situation, whether it does constitute harassment and discrimination or not. (EEOC ¶81) Lakeside is responsible for investigating harassment between its employees that occurs "off premises." (EEOC ¶82) Training on the harassment policy is conducted at orientation when an employee starts work. There is no additional training after orientation on Title VII, harassment, or discrimination. (EEOC ¶83) Scholl did not know what Title VII is, and only received training on racial harassment and discrimination when he first started work at Lakeside in 1987. (EEOC ¶84) Berndt and Lor did not know what Title VII is, and did not recall receiving training on racial harassment, discrimination, or retaliation. (EEOC ¶85)

The Equal Opportunity Employer policy states that Lakeside does not discriminate regarding firing or terms and conditions of employment based on race. (EEOC ¶86) Lakeside said supervisors should not discriminate against employees in relation to attendance and performance expectations. (EEOC ¶87) Lakeside said if a Lead gives a note to a supervisor recommending termination of a temporary employee because he and another employee are not getting along, the supervisor will talk to the lead, look at the situation, the nature of the infraction, the frequency, nature, severity of the infraction, and the supervisor and HR will

decide discipline. (EEOC ¶88) Supervisors and human resources have a responsibility to ensure that conduct is not racially motivated. (EEOC ¶89) Human Resources should ensure employees are not discriminated against, and Title VII is followed. (EEOC ¶90)

Lakeside's attendance policy requires employees to call their immediate supervisor to report any absences or tardiness. After three unscheduled absences in a rolling 12-month period, discipline may result. (EEOC ¶91) In the document assigning Turner to work at Lakeside, it states "You are not under Lakeside Plastic's attendance policy, as you are a QPS employee." (EEOC ¶92) However, QPS said at onboarding or orientation, QPS has the client employer's attendance policy and trains the temporary employees on the client employer's policy. (*Id*.) The policy does not state how many tardies result in discipline. (EEOC ¶93) Lakeside's Progressive Discipline policy applies to poor work performance or misconduct. (EEOC ¶94) Lakeside's policy applies to temporary employees. (EEOC ¶95) Leads and supervisors can recommend progressive discipline. (EEOC ¶96) Before terminating an employee, human resources investigates. (EEOC ¶97)

### III. ARGUMENT

#### A. Legal Standard.

Summary judgment may be granted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Lawson v. CSX Transp., Inc*., 245 F.3d 916, 922 (7th Cir. 2001). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Zerante v.*

*DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). A court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Bishop v. Air Line Pilots Ass'n Int'l*, 5 F.4th 684, 693 (7th Cir. 2021).

**B. EEOC Can Prove Defendant Subjected Turner To Racial Harassment.**

The EEOC can prove its racial harassment claim by showing: (1) Turner was subjected to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was severe or pervasive to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813-14 (7th Cir. 2022). Defendant disputes the third and fourth elements.[4]

**1. The harassment was severe including racial slurs and threats of violence.**

Defendant unconvincingly argues that the harassment was not severe or pervasive enough to create a hostile work environment by focusing on the number of incidents and the number of times a racial epithet was used. (Doc. No. 23, p. 5) Defendant dissects the harassment into three isolated incidents and minimizes the severity, describing it as "casual conversation," "off premises" and a dispute about how to perform a task. (Doc. 23, pp. 7-8) Defendant's argument has been rejected by the Seventh Circuit which held there is no magic number of slurs that indicates a hostile work environment, but an unambiguous racial epithet falls on the more severe end of the spectrum. C*erros v. Steel Technologies, Inc*. 288 F.3d 1040, 1047 (7th Cir. 2002). Here, the harassment falls on the severe end of the spectrum as Moraski called Turner the N-word, which is unambiguous and offensive.

---

[4] Defendant does not dispute that the harassment was unwelcome or based on race. Therefore, the EEOC will not address those elements. *See Costello v. Grundon*, 651 F.3d 614, 629 (7th Cir. 2011) (If the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision.)

Many courts have ruled harassment involving the N-word is sufficiently severe to create a hostile work environment. "For that reason, there may well be a situation in which the one-time use of the N-word can be found to be severe enough to warrant liability. This is because 'the word 'n**ger' is pure anathema to African Americans," *Paschall,* 28 F.4th at 815, quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). "No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African Americans," *Id.*, quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013). The Seventh Circuit ruled that "Given American history, we recognize that the word 'nigger' can have a highly disturbing impact on the listener." *Hrobowski v. Worthington Steel Co*., 358 F.3d 473, 477 (7th Cir. 2004). *See also Bailey v. Binyon*, 583 F.Supp. 923, 927 (N.D. Ill. 1984) (court stated the use of the word "nigger" automatically separates the person addressed from every non-Black person). The Seventh Circuit and the United States Supreme Court have instructed courts to carefully consider the "social context in which particular behavior occurs and is experienced by its target." *Henderson v. Irving Materials, Inc*., 329 F.Supp.2d 1002, 1008-09 (S.D. Ind. 2004), citing *Cerros*, 288 F.3d at 1046, quoting *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998).

In the instant case, the harassment was severe as it involved racial slurs and threats of racial violence. Upon learning Turner was from Milwaukee, Moraski told him he used to knock "niggers" out on the south side of Milwaukee and threatened him to fight. (EEOC ¶6) Turner reported the harassment to his supervisor Lor who ignored his complaint and told him to go back to work. (EEOC ¶8) The harassment escalated the next week when Moraski, in his truck, followed Turner afterwork as he biked home. Moraski threatened to hit Turner off his bike,

yelled that he was going to knock his "nigger ass out" and hang his "nigger ass." Moraski continued the racial terror by making a U-turn, driving back to Turner, and again threatened to fight Turner, knock his "nigger ass out" and hang his "nigger ass." (EEOC ¶11) The following day at work, Turner complained to his supervisor Berndt about Moraski's threats of racial violence, and told Berndt that he feared for his life and did not want to work with Moraski, but Berndt ignored his complaint. (EEOC ¶13) Turner said Moraski sought him out, tried to act like his boss, and he felt that Moraski tried to overpower him. (EEOC ¶14) Turner told Moraski he was going to complain to Berndt, and Moraski said Berndt would not believe him. (*Id.*) Turner again complained to Berndt who told him to go back to work. Turner was upset because Berndt ignored his complaints and forced him to work with Moraski who called him racial slurs, threatened his life, and made him feel unsafe. (EEOC ¶15) Berndt's indifference to Turner's complaint amplified the hostility of the working environment originally created by Moraski. A reasonable jury could find the harassment was severe and created a hostile work environment.

This case is similar to *Henderson* where one of the incidents involved a White employee threatening to drag the Black plaintiff behind his pick-up truck. The court compared the conduct to the murder of James Byrd, a Black man, who was chained to a pick-up truck by White men and dragged to death. The court said Byrd's murder triggered images of lynching, a tactic used by Whites to terrorize and kill Black people. *Henderson*, 329 F.Supp.2d at 1009-10. The court held the threat "has racial connotations that date back to the days when lynching black people in this manner was commonplace." *Id.* at 1010. The court ruled a jury could find that the threat carried "as much racist freight as the most vile racial epithets … combined with the threat of murder." *Id.* The court denied summary judgment holding that a jury could draw reasonable inferences that because of the explicit racist character of one incident, the other superficially

neutral acts of harassment were also based on race. *Id*. Like *Henderson*, this Court could find that because of the racial slurs and horrific threats of racial violence aimed at Turner, the other act of Moraski bossing Turner regarding his work was also based on race and part of the hostile work environment. Courts do not consider incidents in isolation but consider each incident part of a large quilt of racial hostility that a reasonable jury could find established a hostile work environment. *See Daniels v. Essex Group, Inc*., 937 F.2d 1264, 1273-74 (7th Cir. 1991) (An employer may not rebut a claim simply by saying the number of incidents is too few).

In analyzing the totality of the circumstances, courts consider: (1) frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it included physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim. *Scaife v. U.S. Dep't of Veterans Affs*., 49 F.4th 1109, 1116 (7th Cir. 2022). Viewing the facts in favor of the EEOC, a reasonable jury could find based on the totality of the circumstances that the harassment created a hostile work environment. The harassment occurred nearly every week during Turner's employment. It was physically threatening and humiliating as Moraski threatened to fight Turner, knock his "nigger ass" out, knock Turner off his bike with his truck, and hang his "nigger ass." The harassment was directed at Turner. When Turner told Moraski he was from Milwaukee, Moraski said he used to knock "niggers" out in Milwaukee and threatened Turner to go fight. Moraski's threats to hit Turner with his truck and hang him while spewing racial epithets was clearly directed at Turner. The harassment interfered with Turner's work because Moraski sought out Turner, tried to force him to do things his way instead of what the trainer showed him, and told Turner if he complained, the supervisor would not believe him. And, in fact, when he complained, his complaints were ignored and his was

forced to continue to work alongside his harasser for a time. Based on the evidence, a reasonable jury could find the work environment was objectively hostile, and Turner found the harassment subjectively hostile as he objected to Moraski's conduct and reported the harassment. Also, Turner feared for his life and felt unsafe. Accordingly, the harassment was severe, and Defendant's motion should be denied.

## 2. Defendant is liable for harassment as it knew about the unlawful conduct and failed to take appropriate remedial action.

The EEOC can prove that Defendant knew about the harassment. Turner reported harassment at least three times to his supervisors while he was employed at Lakeside. The first complaint was to Lor after Moraski made a racial comment and threatened him to fight. (EEOC ¶8) The second complaint was to Berndt, informing him that Moraski accosted him while he biked home after work, threatened to hit him off his bike, called him racial slurs and threatened to hang him. Turner told Berndt he feared for his life and did not want to work with Moraski. (EEOC ¶13) The third complaint was to Berndt after Moraski sought out Turner and interfered with his work when he had no authority to do so. Turner again told Berndt he did want to work with someone who threatened his life and made him feel unsafe. (EEOC ¶15)

It is undisputed that Lakeside's policy states harassment should be reported to your supervisor or Human Resources. (Emphasis added) (EEOC ¶73) It is also undisputed that the Leads Lor and Berndt were the appropriate people to receive complaints as they were Turner's supervisor. (EEOC ¶2) Moreover the document assigning Turner to work at Lakeside states that harassment should be reported to a supervisor, human resources or QPS. (Emphasis added) (EEOC ¶74) Scholl said if a production employee has an issue, they should report it to their Lead, and the Lead should document it, present it to the supervisor who forwards it to HR. (EEOC ¶2) According to Lakeside's procedures, Leads must report harassment to their

supervisor and HR, and supervisors must report harassment to HR. Leads and supervisors should take notes and provide information to HR. (EEOC ¶75)

A reasonable jury can find that Turner followed the policy and reported the harassment to his supervisors, thus, Defendant knew about it. Defendant's contention that Lakeside was not negligent because Turner did not report the harassment to Scholl, Human Resources or QPS is without merit. (Doc. 23, p. 10) A jury can also conclude that Defendant was negligent in discovering the harassment. When Turner complained, Lor simply sent Turner back to work. (EEOC ¶9) Turner complained to Berndt twice, but Berndt did not take notes or ask questions. Berndt was only concerned with assigning Turner to work. (EEOC ¶¶13, 15) Lor and Berndt both failed to follow Defendant's procedures and a reasonable jury can find Defendant was negligent in discovering the harassment.

Finally, when he was fired, Turner reported the harassment to QPS, and QPS reported it to Lakeside. (EEOC ¶50) Defendant's contention that the harassment was reported "without any reference to racial harassment or discrimination" (Doc. 23, p. 11) is incorrect. Leith admits that QPS reported Turner's race discrimination and harassment complaints to her on July 1, 2019. Leith said QPS told her the harasser was Moraski. Leith admits that QPS informed her that Moraski threatened to fight Turner; Moraski drove next to Turner and threatened to "beat his nigger ass;" Moraski called Turner "nigger;" and Turner complained to his supervisors who ignored him. (EEOC ¶52) Leith also admits that Moraski's conduct violated Lakeside's harassment policy. (EEOC ¶53) A reasonable jury could find that Turner's delay in reporting to QPS was because his supervisor Berndt told him not to, but when Lakeside terminated him, Turner complained about the harassment as he had intended to do. A jury could reject Defendant's claims that it did not know about the harassment.

The EEOC can also prove that Defendant failed to take appropriate corrective action reasonably likely to prevent the harassment from recurring. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3e 1044, 1048 (7th Cir. 2000). Lakeside admits it has a responsibility to address harassment against temporary employees, ensure that harassment does not occur, and investigate harassment that occurs "off premises." (EEOC ¶¶67, 80, 82) Defendant cannot escape liability for Moraski's "off premises" harassment of Turner. The Seventh Circuit held harassment does not have to take place within the physical confines of the workplace to be actionable; it need only have consequences in the workplace. *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008); *Doe v. Oberweis Dairy*, 456 F.3d 704, 715-16 (7th Cir. 2006); *Erickson v. Wisconsin Dept. of Corrections*, 469 F.3d 600, 608 (7th Cir. 2006). Here, Moraski's "off premises" harassment had consequences in the workplace as it made Turner feel uncomfortable and unsafe working alongside Moraski.

Defendant's claim that moving Turner and Moraski to different areas resolved the harassment is without merit. First, Lor did not tell Scholl or Human Resources about Turner's complaints about Moraski. (EEOC ¶¶9, 10) Lor's failure to follow Defendant's procedures and report the harassment enabled it to continue and intensify because about a week later, Moraski threatened Turner with physical harm and called him racial slurs. (EEOC ¶11) Thus, Defendant's claim that Lor separating Turner and Moraski to different departments and that Turner experienced no further racial harassment is belied by the facts. Second, Berndt's failure to report Turner's complaint about the racially threatening incident allowed Moraski to continue to terrorize Turner. (EEOC ¶¶13, 14, 15) Third, a reasonable jury could find the harassment only ended because Defendant terminated Turner's employment not because Berndt separated them.

Defendant relies on *Paschall*, which can be distinguished from the instant case because

here the only action Defendant allegedly took was to move him to a different department which was ineffective and did not stop the harassment. In contrast, in *Paschall*, the employer investigated and issued discipline to the harassers. For one incident, the shift leader who received the complaint, reported it to the supervisor and assistant vice president of human resources. Human resources informed vice presidents and a general manager. *Paschall*, 28 F.4th at 810. The employer reviewed the harasser's evaluations and disciplinary records and interviewed employees. *Id.* One harasser was suspended for three days and issued a write-up that she would be terminated if she ever used the N-word again. The other harasser received written discipline. *Id.* at 815. The court found these actions were reasonable to prevent future harassment. Here, neither Lor nor Berndt reported the harassment to Scholl or human resources as they were required to do. (EEOC ¶75) Moraski was not disciplined, but Turner was fired. (EEOC ¶¶18, 19) Likewise, when Leith received the complaint from QPS, she did not follow Defendant's procedures for investigation. (EEOC ¶¶77, 78, 79, 80) Instead, Defendant's investigation was inadequate as Leith did not talk to Scholl, Berndt or Lor, she did not take notes, she did not review Moraski's evaluations or disciplinary records, she did not interview employees who worked on the shift with Moraski and Turner including Adams and Moore, and she did not write an investigation summary. (EEOC ¶¶54, 55, 56, 57) Instead, Leith disregarded Turner's harassment complaint and told QPS Turner made up the claim. (EEOC ¶58)

Defendant also cannot escape liability simply by the existence of a policy when the policy is ineffective. The policy must not only be effective on paper, but also in practice. *EEOC v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 435 (7th Cir. 2012) A reasonable jury could find Defendant's policy was not effective in practice because Lor and Berndt failed to report Turner's complaints to Scholl and Leith as required. (EEOC ¶75) Also, the effectiveness

of a harassment policy depends on the effectiveness of those designated to implement it. *Id*. at 435. Defendant's employees were only trained on the harassment policy during orientation when they were hired. Scholl was trained in 1987 and neither Berndt nor Lor recalled any training on racial harassment, discrimination or retaliation. (EEOC ¶¶76, 83, 84, 85) And despite the antiharassment policy, Leith took no action to investigate Turner's complaints when they were reported by QPS.

**C. Defendant Terminated Turner Because Of His Race.**

The Seventh Circuit discarded the distinction between the direct and indirect methods of proof in employment discrimination cases and clarified that all evidence must be evaluated as a whole. *Ortiz v. Werner Enterprises, Inc*., 834 F.3d 760, 765 (7th Cir. 2016) The proper inquiry before the Court is whether a reasonable jury could determine based on all the evidence that race was the cause of Turner's termination. In this case, Defendant analyzed the EEOC's termination claim using the indirect, *McDonnell Douglas* burden-shifting approach. However, post-*Ortiz*, the *McDonnell Douglas* framework is not the only method plaintiffs may use to prove their claim. At summary judgment, what matters is whether the plaintiff presented enough evidence to allow a jury to find in his favor. *See Marnocha v. St. Vincent Hosp. and Health Care Center, Inc.,* 986 F.3 711, 718 (7th Cir. 2021); *Igasaki v. Ill. Dept. of Financial and Professional Regulation*, 988 F.3d 948, 957-58 (7th Cir. 2021); *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020). The EEOC proceeds under the *Ortiz* approach arguing that in view of the evidence as a whole, a jury could find that Defendant terminated Turner because of his race. Defendant's reasons of attendance, work performance, inability to take direction and get along with others, and an alleged threat are false.

**1. Turner did not have poor attendance and he was terminated based on race.**

Defendant's claim that Turner had poor performance is rebutted by both documentary and testimonial evidence. The evidence shows that Turner had good attendance and he was on time or early 11 days compared to the two days he was late that Defendant cites as reason for his termination. (Doc. 23, pp. 16-17; EEOC ¶30) In fact, Leith admits that based on Defendant's records, which she claims she reviewed at the time of his termination, this was not poor attendance to warrant termination. (EEOC ¶31) Berndt did not recommend terminating Turner for attendance. (EEOC ¶27) Likewise, Scholl did not recommend Turner be fired for poor attendance and he did not know anything about Turner's attendance. (EEOC ¶28) Lor recalled Turner being late one time and absent one time, but said employees are not terminated for being late or one absence. (EEOC ¶29) As for the absence on June 28, Turner called QPS to report that he was going to be absent and QPS informed Lakeside, therefore, he was not a "no show". (EEOC ¶30) Turner was not counseled, coached, or disciplined about attendance. (EEOC ¶¶32, 33) Thus, the evidence shows Turner's attendance was acceptable, not poor, and Defendant's assertion that it terminated Turner because of poor attendance is untrue.

Instead, a reasonable jury could conclude that Defendant fired Turner because of his race. Defendant argues that "the EEOC cannot show that another similarly situated employee who was not in the protected class was treated more favorably than Turner." (Doc. 23, p. 18) However, a jury could find that Berndt, who is White, was treated more favorably than Turner. Berndt admits he had poor attendance but was not fired. Scholl issued Berndt a verbal warning on October 2, 2019, for violation of Lakeside's attendance policy where Berndt had three unscheduled absences, and Berndt was warned that "Attendance at work, on time and as scheduled, is a core requirement of your job description." (EEOC ¶98) In comparison, Turner had one unscheduled absence, but was fired. A reasonable factfinder can infer discrimination.

Defendant's contention that temporary employees and those hired directly by Lakeside are not comparators is not supported by the facts or Seventh Circuit law. The similarly situated analysis calls for a "flexible, common-sense" examination. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008). While similarly situated employees must be comparable to the plaintiff, they do not need to be identical in every conceivable way. *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 916 (7th Cir. 2010).

Whether a comparator is similarly situated is a question for the factfinder, and summary judgment is appropriate only when no reasonable factfinder could find that plaintiff has met his burden. *Coleman v. Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012). A plaintiff must show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, (3) engaged in similar conduct without such differentiating circumstances as would distinguish their conduct or the employer's treatment of them. *Id.* at 847. When uneven discipline is the basis for a claim of discrimination, the most relevant similarities are those between the employees' alleged misconduct, performance standards and disciplining supervisor rather than job description and duties. *Id.* at 849. Where employees are subject to the same standards outlined in the employee handbook, there is no objective reason for it to apply with greater or lesser force to employees of certain positions. *Id.* Where a comparator violated the same rule as the plaintiff in an equivalent manner, courts should not demand strict factual parallels. *Id.* at 851.

Applying *Coleman*, this Court can find that Berndt is a comparator because both Berndt and Turner dealt with the same supervisor, Scholl. Berndt and Turner were subject to the same standards in that attendance was a requirement of the job. Also, Lakeside's employee handbook

and polices apply to permanent and temporary employees. (EEOC ¶64) Despite Defendant's claims that Turner was under QPS's attendance policy and not Lakeside's policy, a reasonable jury could find based on the evidence as a whole that Defendant applied Lakeside's policy when it terminated Turner. QPS said at onboarding or orientation, QPS has the client employer's attendance policy and trains the temporary employees on the employer's policy. (EEOC ¶¶66, 92) Leith claims she followed QPS's attendance policy with Lakeside's policy as a guide but did not have any evidence to support that she reviewed QPS's policy at the time Lakeside fired Turner. (EEOC ¶32) Finally, the similar conduct was attendance, although Berndt's was worse, Turner was fired, and Berndt received a verbal warning. A jury could disbelieve Turner was fired for attendance but believe he was fired based on race.

### 2. Turner's performance and ability to take direction was good, and Defendant fired him based on race.

The evidence shows that Turner's performance was good. Moore, who trained Turner, said Turner was a good worker who did his job and showed up on time. (EEOC ¶34) Lor told Turner he was doing a good job. (EEOC ¶8, ¶35) Except for the stickering dispute with Moraski, Berndt did not have any issues with Turner or his performance. (EEOC ¶36) Defendant's only evidence of alleged performance and inability to take direction is its claim that Turner stickered incorrectly. But Defendant's witnesses admit stickering incorrectly is not a reason for termination. (EEOC ¶34) Scholl said an employee should not be fired for stickering incorrectly. (EEOC ¶37) Berndt admits other employees also put SKU stickers on the cones incorrectly; this was something that happened with new employees; and this only happened once with Turner. (EEOC ¶16) Turner denies stickering incorrectly. (EEOC ¶99) Defendant mischaracterizes Turner's testimony when it claims Turner made the "idiot" comment to Berndt because he did not want to be trained. Turner made the comment in frustration when Berndt ignored his

harassment complaint and forced him to work with Moraski who called him racial slurs and threatened to hang him. (EEOC ¶15) Defendant omits material facts that Berndt admits Turner calmed down and he had no further incidents with Turner. (EEOC ¶17; EEOC ¶37) Berndt admits that he may have been condescending and not respectful to Turner which escalated the incident. (EEOC ¶42) Defendant's progressive discipline policy applies to temporary employees. (EEOC ¶¶94, 95) Leads and supervisors can recommend progressive discipline. (EEOC ¶96) Berndt could have suggested that Turner be given a verbal or written warning. (EEOC ¶44) It is not plausible that in response to Turner allegedly stickering incorrectly, something that happened one time, but happens frequently with other employees, Defendant would terminate him.

### 3. Turner got along with everyone except Moraski who subjected him to racial harassment, and Defendant fired Turner based on race.

Defendant's claim that Turner failed to get along with employees lacks merit. The only person Turner did not get along with was Moraski, and a reasonable jury could find that Turner did not get along with him because Moraski racially harassed and threatened him. Both Scholl and Berndt said it was possible Turner did not get along with Moraski because of the harassment. (EEOC ¶¶41, 45) Defendant relies solely on Berndt's note and Berndt said the note was based on his belief that Turner could get along with Moraski. (EEOC ¶¶19, 100) However, Berndt said Moraski was toxic, rough, abrasive and had no sense of decorum. (*Id*.) Berndt explained when he described the relationship as "contentious," it was because Turner and Moraski were both frustrated, but they were not arguing or yelling. (EEOC ¶17) Defendant's claim that Moraski was helping Turner by showing him how to perform tasks is rebutted by evidence from Leith, Scholl, Moore, and Moraski's evaluations which support that Moraski sought out Turner and unreasonably interfered with his work despite Moraski having no authority to do so because he was not a Lead or a trainer and Moraski had been counseled about such conduct. (EEOC ¶¶20,

21, 38, 49, 62) A jury could likely believe Moraski was not helping Turner but harassing him.

Turner said Defendant ignored his harassment complaints and terminated him because of his race. (EEOC ¶23) A jury could reach the same conclusion. Defendant failed to follow its own policy that if a Lead gives a note to a supervisor recommending termination of a temporary employee because he and another employee do not get along, the supervisor will talk to the Lead, look at the situation, the nature of the infraction, severity, and the supervisor and human resources will decide on discipline. (EEOC ¶88) Supervisors and human resources have a responsibility to ensure that conduct is not racially motivated. (EEOC ¶89) Scholl did not talk to Berndt or Leith nor did he investigate instead he accepted the note as true. (EEOC ¶25) An employer's departure from its own policies may be evidence of discrimination. *Bagwe v. Sedgwick Claims Management Services, Inc*., 811 F.3d 866, 882 (7th Cir. 2016).

### 4. Defendant's allegation that Turner threatened Moraski is not true, and Defendant fired Turner because of his race.

Defendant's claim that Turner threatened Moraski is insincere and lacks evidence to support it. Turner denies threatening Moraski or telling Moraski to meet him outside. (EEOC ¶46) Neither Scholl nor Berndt knew if Moraski's allegation that Turner threatened him was true and no one at Lakeside investigated the veracity of the claim. (EEOC ¶¶47, 48, 49) Thus, a reasonable jury could conclude that Defendant's belief of this unverified allegation was racially motivated, and its termination of Turner was because Turner is Black and Moraski is White.

### D. Defendant Retaliated Against Turner For Complaining of Racial Harassment.

As previously stated, there is not a distinction between direct and indirect evidence in retaliation cases and this Court should consider all the evidence to determine whether a causal link exists. *Stepp v. Covance Central Laboratory Services, Inc*., 931 F.3d 632, 635 (7th Cir. 2019) Turner engaged in protected activity when he opposed the harassment on at least three

occasions. Turner reported the harassment to Lor. (EEOC ¶8) On June 30, Turner reported the harassment two times to Berndt. (EEOC ¶¶13, 14, 15) When Berndt ignored his complaint the second time, Turner told him he was going to report the harassment to QPS. (EEOC ¶15) That same day, Berndt wrote a note to Scholl recommending Turner be fired. (EEOC ¶18) The next day July 1, Defendant terminated Turner. (EEOC ¶22) Courts hold suspicious timing can raise the inference of a causal connection. When an adverse action comes close on the heels of protected activity, an inference of causation is sensible. *See Clark County School District v. Breeden*, 532 U.S. 268, 273 (2002); *Loudermilk v. Best Pallet Co., LLC*., 636 F.3d 312, 315-16 (7th Cir. 2011) "The closer two events are, the more likely the first caused the second … an inference of causation would be reasonable here. A jury, not a judge, should decide whether the inference is appropriate." *Loudermilk,* 636 F.3d at 315.

In this case, Berndt recommended Turner's termination and Scholl and Leith rubber stamped it. (EEOC ¶¶3, 18, 22, 24, 25) Scholl said the termination was based on Berndt's note. Scholl did not talk to Leith, and she did not investigate why he wanted Turner terminated. Scholl did not investigate or talk to Berndt, but simply accepted the note. (EEOC ¶25) Given these facts, the EEOC can establish the causal link because the decisionmaker operated as a "cat's paw" for Berndt. Under the cat's paw theory an employer is liable for the retaliatory actions of a subordinate who lacked formal decision-making power if the subordinate's action were the proximate cause of the adverse action. *See Staub v. Proctor Hosp*., 562 U.S. 411, 422 (2011); *Vesey v. Envoy Air, Inc*., 999 F.3d 456, 461-62 (7th Cir. 2021) An employer is liable when a non-decision-making employee with retaliatory animus provided information that may have affected the adverse action. *See Sinha v. Bradley University*, 995 F.3e 568, 573-74 (7th Cir. 2021) Berndt's actions were motivated by animus. Evidence of hostility towards discrimination

complaints can support an inference of animus to support a discrimination claim. *See Younker v. City of Wood River, Ill.*, Case No. 22-cv-204-JPG, 2023 WL 3258218, *10 (S.D. Ill. May 4, 2023) Berndt exhibited animus when he ignored Turner's harassment complaints, and recommended Turner be terminated instead of Moraski. A reasonable jury could find Berndt was motivated by retaliatory animus when he told Scholl to fire Turner. Defendant is also liable for retaliation for refusing to rehire Turner despite learning that his harassment complaint was true. Leith admits a month after Turner's termination, she contacted QPS and informed them that Turner's complaints were true. However, Defendant refused to rehire Turner. (EEOC ¶¶59, 63) A jury could find Defendant refused to rehire Turner in retaliation for his discrimination complaints.

Finally, a factfinder could find Defendant discriminated against Turner because of his race and complaints of racial harassment. District courts in the Seventh Circuit have recognized "race plus" claims where the law prohibits individuals from being subjected to discrimination because of the intersection of their race and a trait covered by another EEO statute. *Kimble v. Wisconsin Dept. of Workforce Development*, 690 F.Supp.2d 765, 769-70 (2010) In *Kimble*, the court recognized that African American men may bring intersectional claims citing that Black males are subject to distinct stereotypes including false assumptions that Black men have a bad temper. *Id*. at 771. While the EEOC is unaware of any cases within the Seventh Circuit in which a plaintiff has alleged they were terminated due to both race and retaliation, it stands to reason that as both race discrimination and retaliation are prohibited under Title VII, they would also be unlawful when they occur in combination. A reasonable jury could find that Defendant's adverse employment action in response to Turner's complaint about Moraski compared to the way it handled Adams' complaint was based on Turner's race and protected activity.

## IV. CONCLUSION

Based on the foregoing case law, evidence and arguments, this Court should deny

Defendant's motion for summary judgment in its entirety.

Dated: March 4, 2024.                    Respectfully submitted,

                                         EQUAL EMPLOYMENT OPPORTUNITY
                                         COMMISSION

                                         /s/ Tina Burnside
                                         Tina Burnside (WI#1026965)
                                         Senior Trial Attorney
                                         Equal Employment Opportunity Commission
                                         Minneapolis Area Office
                                         330 South Second Avenue, Suite 720
                                         Minneapolis, MN 55401
                                         Email: tina.burnside@eeoc.gov
                                         Telephone: (612) 552-7319


                                         /s/ Greger Calhan
                                         Greger Calhan
                                         Trial Attorney
                                         Equal Employment Opportunity Commission
                                         Minneapolis Area Office
                                         330 South Second Avenue, Suite 720
                                         Minneapolis, MN 55401
                                         Email: greger.calhan@eeoc.gov
                                         Telephone: (612) 552-7323