UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | Case No. 1:22-cv-01149-WCG |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| LAKESIDE PLASTICS, INC., | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFF EEOC'S STATEMENT OF ADDITIONAL FACTS**

1. Brian Turner ("Turner") was employed with the temporary staffing firm QPS Employment Group ("QPS") which placed him to work at Lakeside Plastics on or about June 6, 2019. Turner worked at Lakeside from June 6 to June 30, 2019. (Burnside Decl., Ex. 12; Ex. 1, Turner Dep. 169:8-17) Turner worked as a Production Technician in the Cones department on the first shift, weekends, Thursday – Sunday, from 7 am to 3 pm. (Burnside Decl., Ex., 12 and 13) The position was temporary-to-hire and Turner could be hired permanently after 60 days. (Burnside Decl., Ex. 1, Turner Dep. 124:1-8; Ex. 5, Leith Dep. 69:18-22)

2. Turner was supervised by Leads Max Berndt and Japan Lor. (Burnside Decl., Ex. 12; Ex. 1, Turner Dep. 69:8-25, 70:1-6) Scott Scholl was the supervisor in the safety division and did not work directly with the production technicians. (Burnside Decl., Ex. 6, Scholl Dep. 8:23-24, 9:1-3, 10:19-21) Leads supervised the production technicians. (Burnside Decl., Ex. 8, Lor Dep. 11:20-24, 12:1-2; Ex. 7, Berndt Dep. 15:4-17; Ex. 6, Scholl Dep. 10:19-24, 11:1-2) Scholl supervised the Leads. (Burnside Decl., Ex. 6, Scholl Dep. 13:16-21) If

a production employee has an issue, he should report it to his Lead. (*Id.*, Scholl Dep. 14:5-13)

3. Leads did not have firing authority, but they could recommend that employees be terminated. (Burnside Decl., Ex. 8, Lor Dep. 13:3-5; Ex. 7, Berndt Dep. 18:1-3)

4. Curt Moraski was a production technician. He was not a trainer or a Lead. (Burnside Decl., Ex. 7, Berndt Dep. 24:8-14, 47:12-16)

5. During his employment at Lakeside, Turner rode his bike to work. About the second day of work, he met Moraski who offered to give Turner a ride home. Moraski gave Turner a ride home at least twice during the first week of Turner's employment. (Burnside Decl., Ex. 1, Turner Dep. 88:3-25)

6. While working together either the second or third week of his employment, Moraski told Turner he was from Milwaukee – the same city as Turner – and Moraski said he used to knock "niggers" out on the south side of Milwaukee. (Burnside Decl., Ex. 1, Turner Dep. 89:11-19, 169:8-17) Turner told Moraski that he did not care for that type of conversation, and Moraski responded that they could go out to the parking lot. Turner told Moraski he did not have time for his behavior and kept his distance from Moraski. (*Id.*, Turner Dep. 90:19-25, 91:1-7)

7. Turner worked at Lakeside from June 6 to June 30, 2019. Turner testified he had difficulty recalling the dates of the harassment but believes the first incident occurred either his second or third workweek, which would have been either June 13 – June 16 or June 20 to June 23, 2019. (Burnside Decl., Ex. 1, Turner Dep. 169:8-17)

8. Turner reported the harassment to Lor, telling him that Moraski said he used to knock "niggers" out on the southside of Milwaukee, and Moraski threatened him to go to the

parking lot to fight. (Burnside Decl., Ex. 1, Turner Dep. 94:9-18, 95:1-13) Turner said

Lor told him he was doing a good job and to go back to work. (*Id.*, Turner Dep. 95:24-25,

96:1) Lor did not take notes or ask any questions. (*Id.*, Turner Dep. 96:14-20)

9.  Lor admits Turner complained to him that he did not get along with Moraski and could

    not work with him. (Burnside Decl., Ex. 8, Lor Dep. 29:9-24) Lor moved them to

    separate departments. (*Id.*, Lor Dep. 30:15-17) Lor did not ask Turner why he could not

    work with Moraski. (*Id.*, Lor Dep. 30:21-23) Lor did not talk to Moraski. (*Id.*, Lor Dep.

    31:4-6)

10. Keith Moore, who is Black, also complained to Lor that he could not work with Moraski.

    (Burnside Decl., Ex. 8, Lor Dep. 31:10-15) Lor separated Moore and Moraski to different

    departments. (*Id.*, Lor Dep. 32:5-12) Lor did not tell Scholl or Human Resources about

    Turner's or Moore's complaints about Moraski. (*Id.*, Lor Dep. 34:23-24, 35:1-2) Lor

    never spoke to Scholl, Leith or Human Resources about Turner. (*Id.*, Lor Dep. 35:14-20)

11. Moraski escalated the harassment the fourth week of Turner's employment, on Saturday

    June 29, 2019, Turner said after work while he was biking home, he took a different route

    to avoid Moraski, but they ended up at the same intersection. Turner turned right, and

    where Moraski would normally turn left, instead, he followed Turner. (Burnside Decl.,

    Ex. 1, Turner Dep. 99:20-25, 100:1-11) Turner looked back when he heard Moraski's

    truck, and Moraski pulled beside Turner who was on his bike. (*Id.*, Turner Dep. 101:11-

    16) Moraski followed Turner and yelled at Turner to get off his bike so they could fight.

    Turner refused so Moraski threatened to hit Turner off his bike. Turner said "…it made

    me feel then, like my life was in danger." (*Id.*, Turner Dep. 102:11-23) Turner stopped

    his bike, and Moraski yelled out the window that he was going to knock his "nigger ass

out." Moraski threatened Turner saying, "I'm going to hang your nigger ass." Turner told Moraski he did not have time for his conduct, and Moraski pulled off. (*Id.*, Turner Dep. 103:2-20) Turner crossed the street, but Moraski made a U-turn, drove back to Turner and again threatened him, saying he was going to fight Turner, knock his "nigger ass out" and "hang his nigger ass." (*Id.*, Turner Dep. 104:4-10) Turner kept riding his bike to get away from Moraski. "My main thing was just – human nature, fight or flight. It was the flight. Get out of the situation. It was me on the bike versus a truck." (*Id.*, Turner Dep. 105:1-7) Moraski drove off and Turner biked home. Turner said, "I feared for my house and my life because he dropped me off twice, so I didn't know if he was going to come to my house and try to do something to me or my family." (*Id.*, Turner Dep. 105:11-18)

12. On Sunday June 30, 2019, Turner told Moore about the harassment, and that he did not feel safe. (Burnside Decl., Ex. 1, Turner Dep. 117:12-25, 118:1-4) Moore witnessed the harassment where Moraski followed Turner on his bike. Moore said Moraski veered his truck off to the side of the road near Turner and Moraski was shouting out the window. Moore did not stay at the scene. (Burnside Decl., Ex. 9, Moore Dep. 39:7-22) Moore said Moraski was very angry at Turner. (*Id.*, Moore Dep. 40:18-20) Moore stated, "Brian said he feared for his life when he told me the next day." (*Id.*, Moore Dep. 41:1-2) When he witnessed the incident, Moore was worried that it could turn violent. "… And I'm like, wow, I just hope he don't run the guy, poor guy over with his truck and he's on the bike." (*Id.*, Moore Dep. 41:6-10) Moore said Turner told him that Moraski called him the N-word and wanted to fight him. (*Id.*, Moore Dep. 43:13-24) Moore said Turner was shaken by the incident and he told him to report the harassment because it could continue, and

something seriously could end up happening to Turner. (*Id.*, Moore Dep. 44:1-9) Moore, who also worked the Thursday – Sunday shift, reported the harassment to Lor a few days later when he worked his shift with Lor. Moore told Lor that Moraski threatened Turner with violence and called him racial insults. (*Id.*, Moore Dep. 45:5-13, 46:5-17, 47:11-19, 48:4-12) Moore also reported the harassment to Scholl and Leith. (*Id.*, Moore Dep. 48:13-24, 49:1-2)

13. Turner reported the harassment to Berndt. Turner told Berndt that Moraski pulled next to him in his truck while he was biking home, and Moraski said he was going to "hang my nigger ass, knock my nigger ass out, and how he gonna hit me with his truck." Turner told Berndt he feared for his life, and he did not want to work with Moraski. (Burnside Decl., Ex. 1, Turner Dep. 71:9-23, 73:6-17, 74:5-15, 118:25, 119:1-9, 120:1-6) Berndt did not take notes or ask questions. Berndt was only concerned with assigning Turner to his workstation (*Id.*, Turner Dep. 74:1-4, 16-20)

14. Turner worked the station pouring black footings for the cones, but Defendant later moved him to a different area to label boxes. Moore showed him what to do. (Burnside Decl., Ex. 1, Turner Dep. 74:21-25, 75:1-8, 15-25, 76:1-15) Moraski sought out Turner and told him that he was the boss, and Turner had to listen to him. Turner told him that Moore already showed him what to do, and that Moraski was his coworker not his boss. (*Id.*, Turner Dep. 76:22-25, 77:1-6, 81:15-23) Turner felt Moraski tried to "overpower" him. (*Id.*, Turner Dep. 82:4-7) Turner told Moraski he was going to complain to Berndt, and Moraski replied that Berndt would not believe Turner, but would believe him (Moraski). (*Id.*, Turner Dep. 79:17-22)

15. Turner did not feel safe working with Moraski and again complained to Berndt, who told

him to go back to work. Turner became upset and told Berndt that he was forcing him to work with "somebody who sit her and threaten my life and make me feel unsafe here. I feel like y'all are trying to play me, y'all are trying to play me like I'm dumb, just – I feel like you're all trying to play me like a fucking idiot and I'm about to call QPS." (Burnside Decl., Ex. 1, Turner Dep. 77:12-21, 175:7-18) When Turner threatened to call the staffing firm, Berndt told him not to do that and moved him to a different workstation. (*Id.*, Turner Dep. 77:22-25, 84:16-22) Berndt did not take notes of Turner's complaint. (*Id.*, Turner Dep. 83:23-25, 84:1-4)

16. Berndt claims on Saturday June 29, 2019, he observed Turner putting SKU stickers unsatisfactorily on construction cones, and this caused a conflict between Turner and Moraski. (Burnside Decl., Ex. 7, Berndt Dep. 43:2-15) Berndt admits that other employees also put SKU stickers on the cones incorrectly, and this was something that happened with new employees. (*Id.*, Berndt Dep. 43:20-24, 44:1-3) He said this only happened on this one occasion with Turner. (*Id.*, Berndt Dep. 44:12-15)

17. Berndt said Turner and Moraski were both frustrated, but they were not arguing or yelling. (Burnside Decl., Ex. 7, Berndt Dep. 44:19-24) Berndt claims he tried to train Turner on stickering, but instead of taking instruction, Turner had a lack of interest. (*Id.*, Berndt Dep. 46:12-20) Berndt did not work with Turner before this incident or have any other conflict with Turner. (*Id.*, Berndt Dep. 46:21-24, 47:1-2) Berndt did not recall any performance problems with Turner other than this incident with Moraski. (*Id.*, Berndt Dep. 47:3-7) Berndt claims he separated them to different departments. (*Id.*, Berndt Dep. 47:17-24, 48:1-3) He calmed down Turner and there were no further incidents that day. (*Id.*, Berndt Dep. 48:16-20)

18. Based on this disagreement between Turner and Moraski, Berndt wrote a note to Scholl recommending that Turner be terminated. (Burnside Decl., Ex. 15; Ex. 25, Def. Response to EEOC Request for Admissions Nos. 17 and 18) In the note, Berndt claims the next day Sunday June 30, 2019, Turner told Moraski he was going to "meet him outside" so he had to keep them in different parts of the building. (Burnside Decl., Ex. 15) However, at his deposition Berndt testified he could not remember what the comment "meet him outside" was about, and he thought the incidents occurred all in one day, but he wrote it as two days in the note so "I'm not confident I can answer correctly." (Burnside Decl., Ex. 7, Berndt Dep. 49:12-17) Berndt admits he does not recall if he heard Turner tell Moraski to "meet him outside" or if that was something Moraski told him. (*Id.*, Berndt Dep. 50:3-8) Berndt also wrote, "You may want to replace him, I don't think he's gonna be able to get along with some of the guys around here." (Burnside Decl., Ex. 15)

19. Berndt did not think Turner could get along with Moraski. He did not recall anyone else Turner could not get along with. (Burnside Decl., Ex. 7, Berndt Dep. 51:6-18) Berndt described Moraski as a rough individual who was abrasive and had no sense of decorum. (*Id.*, Berndt Dep. 51:6-9) Berndt said Moraski wanted things his way and would get frustrated. Berndt admits that Moraski got frustrated with him. (*Id.*, Berndt Dep. 52:3-12) Berndt said Moraski was "not great culturally for the environment of the working area," and "He just rubbed people the wrong way, and it could get kind of toxic." (*Id.*, Berndt Dep. 51:19-24, 52:1-2, 23-24, 53:1-3)

20. Other employees had difficulty getting along with Moraski. Alex Adams said Moraski threatened to fight him. (Burnside Decl., Ex. 10, Adams Dep. 26:21-24, 27:1-9) Adams said Moraski did not get along with Moore and he recalled an incident where Moraski

called Moore "A piece of shit and then he call him the N-word." (*Id.*, Adams Dep. 22:3-24, 23:1) Adams, who is White, said Moraski was a racist because of the way Moraski interacted with Black employees. (*Id.*, Adams Dep. 25:12-16) Moore trained Moraski when Moraski started as a temporary employee. (Burnside Decl., Ex. 9, Moore Dep. 35:16-21) Moore said Moraski always wanted to be a trainer, but he was not. "He pretty much wanted to take my job from me, basically." Moore said Moraski told him he did not need any training. Moore said Moraski tried to "one up" on Turner trying to tell him what to do, but Turner told Moraski that he was not the trainer or the Lead, and Turner said he was going to follow instructions from the Lead. (*Id.*, Moore Dep. 36:23-24, 37:1-8) Moore described Moraski as a "cocky type of guy" and he had issues trying to train him because Moraski wanted to take things into his own hands and do it his way. (*Id.*, Moore Dep. 45:13-19) Moore said Moraski looked at him in an intimidating way. (*Id.*, Moore Dep. 45:19-21, 46:2-4)

21. Defendant documented Moraski's negative conduct in employee evaluations. In an evaluation dated June 27, 2019, Defendant wrote that Moraski "has a tendency to make others feel hesitant asking him/her for help as they do not know the reaction they will get. Needs to work on effective communication by speaking to others in a respectful manner. Needs to improve communication skills by being more positive when speaking to others and provide encouragement." (Burnside Decl., Ex. 20; Ex. 25, Def. Response to EEOC Request for Admissions, Nos. 9 and 10) Scholl admits he wrote this about Moraski's conduct based on information from Leads Lor and Berndt. (Burnside Decl., Ex. 6, Scholl Dep. 57:3-24, 58:1-16) Scholl said Lor and Berndt told him Moraski needed to work on effective communication and speaking to people in a respectful manner. (*Id.*, Scholl Dep.

58:12-16) Scholl admits the June 27, 2019 evaluation was conducted prior to Turner

being terminated. (*Id.*, Scholl Dep. 59:1-4) In an evaluation dated September 20, 2018,

Defendant wrote that Moraski "needs to stop being so loud on the shop floor. Don't

worry about what other people are doing." (Burnside Decl., Ex. 20; Ex. 25, Admissions

Nos. 9 and 11) Scholl admits this was information he obtained from Leads Lor and

Berndt. (Burnside Decl., Ex. 6, Scholl Dep. 59:5-22)

22. Defendant terminated Turner on July 1, 2019. (Burnside Decl., Ex. 15; Ex. 6, Scholl Dep.
     45:18-19; Ex. 5, Leith Dep. 75:9-10)

23. Turner said Defendant ignored his racial harassment complaints, and took an adverse
     action against him, termination, because of his race. (Burnside Decl., Ex. 1, Turner Dep.
     147:15-25, 148:1-7)

24. Kelly Leith, Human Resources Director, said she and Scholl made the decision.
     (Burnside Decl., Ex. 5, Leith Dep. 106:4-6) Leith claims she talked to Scholl about the
     decision to terminate Turner but did not have any documentation of this conversation.
     (*Id.*, Leith Dep. 109:16-23)

25. Scholl said it was HR's decision, and he only suggested termination by forwarding
     Berndt's note to Leith. (Burnside Decl., Ex. 6, Scholl Dep. 45:18-24, 46:1) Scholl said
     his recommendation was based on Berndt's note, and the note was the only
     documentation he reviewed. (*Id.*, Scholl Dep. 48:5-8, 49:4-8) Scholl did not talk to Leith
     about the termination decision. (*Id.*, Scholl Dep. 47:15-22, 48:2-4) Scholl said Leith did
     not contact him or investigate why he wanted Turner terminated. (*Id.*, Scholl Dep. 47:23-
     24, 48:1) Scholl did not talk to Berndt, stating "I accepted the note and forwarded it to
     HR." (*Id.*, Scholl Dep. 48:9-13) Scholl said he always accepts a termination

recommendation from the Lead and then forwards it to HR. He does not conduct any

independent investigation. (*Id.*, Scholl Dep. 32:16-22)

26. Turner never received any discipline at Lakeside. (Burnside Decl., Ex. 1, Turner Dep.
139:4-5) Leith said Turner did not have any written warnings before he was fired.
(Burnside Decl., Ex. 5, Leith Dep. 122:20-22)

27. Berndt did not recommend terminating Turner for attendance. (Burnside Decl., Ex. 7,
Berndt Dep. 57:20-23) Berndt did not recall any issue with Turner's attendance, and he
did not look at Turner's attendance records when recommending his discharge. (*Id.*,
Berndt Dep. 58:10-16) Berndt said if Turner had attendance issues, he would have told
Scholl. (*Id.*, Berndt Dep. 58:7-9) Berndt has never recommended that someone be fired
because they were one or five minutes late. (*Id.*, Berndt Dep. 61:12-15)

28. Scholl did not review Turner's attendance records or recommend Turner be fired for poor
attendance. Scholl did not know anything about Turner's attendance. Scholl admits that
Berndt's note did not mention poor attendance. (Burnside Decl., Ex. 6, Scholl Dep. 49:9-
20)

29. Lor recalled Turner being late one time and absent one time. Lor said employees are not
terminated for being late, and they are not terminated for one absence. (Burnside Decl.,
Ex. 8, Lor Dep. 36:16-21)

30. Defendant's attendance records do not show Turner had poor attendance. According to
the records (date and time punched in): 6/6 at 7 am; 6/7 at 7:05 am; 6/8 at 7 am; 6/9 at
7:02 am; 6/13 at 6:55 am; 6/14 at 6:58 pm; 6/15 at 6:56 am; 6/16 at 6:58 am; 6/20 at 6:55
am; 6/21 at 6:55 am; 6/22 at 7:07 am; 6/23 at 6:57 am; 6/27 at f6:56 am; 6/28 absent;
6/29 at 6:55 am. Also, according to the records, Turner called QPS to report that he was

going to be absent on 6/28 and QPS informed Lakeside. (Burnside Decl., Ex. 23)

31. Leith admits that based on Defendant's records Turner was either on time or early more days than he was late. (Burnside Decl., Ex. 5, Leith Dep. 117:10-24, 118:1-24, 119:1-24, 120:1-4) Leith admits that if Turner was early or on time more days than he was late or absent that was not poor attendance to warrant him being terminated. (Burnside Decl., Ex. 5, Leith Dep. 120:15-19)

32. Leith said she reviewed Turner's attendance records at the time Lakeside fired him. She said nobody told her to do so, then said she did not recall who told her to do it, then said perhaps Scholl or herself. Leith claims she discussed Turner's attendance with Scholl. (Burnside Decl., Ex. 5, Leith Dep. 113:17-24, 114:1-5) Leith claims she followed QPS's attendance policy with Lakeside's policy as a guide but did not have any evidence to support that she reviewed QPS's policy at the time Lakeside fired Turner. (*Id.*, Leith Dep. 121:2-24, 122:1-3) Leith did not tell Turner he had poor attendance and does not know if anyone else did. (*Id.*, Leith Dep. 122:15-19)

33. Turner was not counseled, coached or disciplined about attendance. (Burnside Decl., Ex. 1, Turner Dep. 164:2-4, 167:3-5, 168:14-16, 174:4-9) Defendant acknowledged Turner called QPS on June 28 to report that he was going to be absent and QPS informed Lakeside. (Burnside Decl., Ex. 23, Def000196)

34. Turner worked with Moore who was a trainer. (Burnside Decl., Ex. 9, Moore Dep. 37:19-20; Ex. 7, Berndt Dep. 23:19-22) Moore said Turner was a good worker who came in, did his job, and showed up on time. Moore said Turner worked well with him. (Burnside Decl., Ex. 9, Moore Dep. 32:4-19) Moore is not aware of anyone being fired for making a mistake with stickering. (Burnside Decl., Ex. 9, Moore Dep. 18:18-24, 19:1-8)

35. Lor did not recall having any problems with Turner or his work. (Burnside Decl., Ex. 8, Lor Dep. 36:3-9)

36. Except for the stickering dispute, Berndt did not have any issues with Turner's work performance. (Burnside Decl., Ex. 7, Berndt Dep. 61:16-22)

37. Scholl did not interact with Turner nor did he observe Turner's work. (Burnside Decl., Ex. 6, Scholl Dep. 35:7-24, 36:1-3) Scholl had no first-hand knowledge about the stickering issue, and information about Turner's performance was based on Berndt's note. (*Id.*, Scholl Dep. 49:21-24, 50:1-11) Scholl said an employee should not be fired for stickering incorrectly. (*Id.*, Scholl Dep. 50:12-16) Scholl did not ask Berndt about Turner having an attitude with him. (*Id.*, Scholl Dep. 51:2-17)

38. Leith had no personal knowledge about Turner's performance, she did not interact with him, and she had no first-hand knowledge about his conduct. (Burnside Decl., Ex. 5, Leith Dep. 67:20-24, 68:3-11, 18-21, 69:13-17) Leith said Moraski had no authority to tell Turner how to do his job because Moraski was not a lead or supervisor. (*Id.*, Leith Dep. 101:19-24, 102:1)

39. The only employee Turner did not get along with was Moraski. (Burnside Decl., Ex. 5, Leith Dep. 123:14-16)

40. Leith never talked to Turner about Defendant's claim that he could not get along with coworkers. (Burnside Decl., Ex. 5, Leith Dep. 123:11-13)

41. Berndt admits it was possible that Turner did not get along with Moraski because Moraski called him racial slurs and threatened him. (Burnside Decl., Ex. 7, Berndt Dep. 63:21-24, 64:1-5)

42. Berndt admits that it is possible that he (Berndt) was condescending and not respectful

which escalated the incident with Turner. (Burnside Decl., Ex. 7, Berndt Dep. 71:24, 72:1-4) Berndt acknowledge that his own social skills were a weakness. Berndt said he was more focused on getting the work done than connecting with people. (*Id.*, Berndt Dep. 65:11-21; Ex. 21) Berndt admits that he was not always calm and patient with new employees, and he was not friendly to new temps. (*Id.*, Berndt Dep. 66:8-24) "It was a constant struggle for me to – throughout my time there to get my own work done and guide new employees as much as they needed. It was a struggle." (*Id.*, Berndt Dep. 67:1-4) Berndt admits he had issues being respectful and talking down to employees. (*Id.*, Berndt Dep. 68:15-17)

43. On more than one occasion, Scholl wrote in Berndt's evaluations that he needs to work on talking to employees on their level without being condescending and being respectful. (Burnside Decl., Ex. 21, Def 000405-06; Ex. 25, Def's Responses and Objections to Plaintiff's Requests for Admission, Nos. 12 and 13)

44. Berndt did not tell Turner that he was going to get written up or fired if his conduct continued related to stickering. (Burnside Decl., Ex. 7, Berndt Dep. 54:16-23) Berndt could have suggested a verbal or written warning instead of termination. (*Id.*, Berndt Dep. 55:9-24, 56:1)

45. Scholl had no first-hand knowledge about Turner not getting along with Moraski. (Burnside Decl., Ex. 6, Scholl Dep. 50:17-22) Scholl admits that if Moraski called Turner racial slurs and threatened him, it would be reasonable for Turner to not get along with Moraski. (*Id.*, Scholl Dep. 52:20-24)

46. Turner denies threatening Moraski or telling Moraski to meet him outside. (Burnside Decl., Ex. 1, Turner Dep. 177:16-21)

47. Berndt admits he did not know if Moraski's allegation that Turner threatened him was true. (Burnside Decl., Ex. 7, Berndt Dep. 69:13-20) Berndt did not specifically write in the note to Scholl that Turner said he was going to meet Moraski outside to fight him. (*Id.*, Berndt Dep. 70:14-17) Berndt did not recall if he heard Turner say to Moraski "meet me outside" or if Moraski told him it happened. (*Id.*, Berndt Dep. 70:18-24)

48. Scholl did not know if Turner told Moraski to meet him outside or what he was telling him to meet him outside about. (Burnside Decl., Ex. 6, Scholl Dep. 51:21-24, 52:1-13)

49. Scholl acknowledged he was aware that Moraski had a problem telling people what to do and being disrespectful. Scholl admits if he would have looked at Moraski's evaluations he may have remembered. Scholl said what he wrote in Moraski's evaluations about his conduct may have changed his decision to terminate Turner because of the disagreement with Moraski. (Burnside Decl., Ex. 6, Scholl Dep. 60:1-15) Scholl then changed his testimony and claimed he fired Turner because Turner threatened Moraski. (*Id.*, Scholl Dep. 60:17-24) Scholl admits he had no evidence that Turner threatened Moraski. Scholl did not investigate to determine if the allegation was true nor did Human Resources investigate if it was true. (*Id.*, Scholl Dep. 61:1-18)

50. On July 1, 2019, when QPS informed Turner that Lakeside terminated him, Turner reported the racial harassment to QPS. (Burnside Decl., Ex. 22; Ex. 1, Turner Dep. 179:23-25, 180:1-25, 181:1-6)

51. QPS Senior Recruiter Sarah Hershberger documented Turner's complaint. (Burnside Decl., Ex. 22, EEOC 0000681-82; Ex. 3, Hershberger Dep. 30:11-20, 32:20-24, 33:1-14, 35:3-6) Hershberger said QPS informed Lakeside about Turner's complaint. (Burnside Decl., Ex. 3, Hershberger Dep. 40:14-24, 41:1-3)

52. Leith admits that QPS reported Turner's race discrimination and harassment complaints to her on July 1, 2019. (Burnside Decl., Ex. 5, Leith Dep. 72:23-24, 73:1-6, 80:8-14) Leith said QPS told her the harasser was Moraski. (*Id.*, Leith Dep. 77:21-24, 78:1-5) Leith admits that QPS informed her that Moraski threatened to fight Turner; Moraski drove next to Turner and threatened to "beat his nigger ass;" Moraski called Turner "nigger;" and Turner complained to his supervisors who ignored him. (*Id.*, Leith Dep. 80:15-24; Ex. 22, EEOC 0000678-84)

53. Leith admits that Moraski threatening Turner with racial violence and calling him racial slurs violated Lakeside's harassment policy. (Burnside Decl., Ex. 5, Leith Dep. 78:19-24, 79:1-5)

54. After receiving the complaint from QPS, Leith claims she had separate, face-to-face conversations with Scholl, Berndt, Lor and Moraski. (Burnside Decl., Ex. 5, Leith Dep. 85:16-24, 86:1-7) Leith did not take any notes. (*Id.*, Leith Dep. 81:1-7, 16-21, 83:24, 84:8-16) Leith said Scholl had no information about the harassment. She did not tell Scholl to investigate and talk to employees. (*Id.*, Leith Dep. 82:10-21) Leith claims she spoke with Berndt and Lor, and both said they did not have any information. (*Id.*, Leith Dep. 82:22-24, 83:1-14, 84:4-19) Leith said she did not recall if she told Berndt and Lor about Turner's allegations. (*Id.*, Leith Dep. 84:20-22) Leith got a statement from Moraski. (*Id.*, Leith Dep. 84:23-24, 85:1-12; Ex. 14) Leith admits that Moraski's statement did not address Turner's harassment claim. Leith also admits that if Moraski was going to deny the harassment, he would have written it in his statement. Leith did not know why she believed that Moraski did not harass Turner. (*Id.*, Leith Dep. 100:6-20) Leith did not ask anyone else to write statements. (*Id.*, Leith Dep. 85:13-15) Leith did not

talk to any employees who worked with Turner and Moraski including Moore and Adams. (*Id.*, Leith Dep. 86:14-23) Leith did not write a report of her investigation; she did not review documents; and she did not review harassment or discrimination law. (*Id.*, Leith Dep. 87:4-13) Leith concluded there was no report of it occurring, but admits the harassment could have occurred, but it was not reported. (*Id.*, Leith Dep. 87:14-23)

55. Scholl did not have any conversations with Leith where she informed him that QPS reported that Turner said Moraski harassed him. Scholl did not recall Leith or anyone investigating Turner's harassment complaint. (Burnside Decl., Ex. 6, Scholl Dep. 40:15-19, 41:2-6, 13-16) Scholl did not know about the complaint in 2019 but, learned about it during the EEOC investigation. (*Id.*, Scholl Dep. 42:2-6, 15-24, 43:1-2) Scholl did not see Moraski's statement. (*Id.*, Scholl Dep. 44:3-10) Scholl did not talk to Lor or any employees about Turner. (*Id.*, Scholl Dep. 44:18-23) He did not talk to Berndt until the EEOC investigation. (*Id.*, Scholl Dep. 44:24, 45:1-2)

56. Berndt first learned about Turner's complaint from Leith during the EEOC's investigation when he was interviewed by the EEOC. (Burnside Decl., Ex. 7, Berndt Dep. 37:3-20, 39:16-21) Scholl and Berndt were interviewed by the EEOC investigator on December 7, 2021, two years after Leith claims she conducted her investigation. (Burnside Decl., Ex. 19)

57. Lor never spoke to Leith about Turner. (Burnside Decl., Ex. 8, Lor Dep. 35:18-20; Ex.24, Def. Responses and Objections to Plaintiff's First Set of Interrogatories, No. 2)

58. Leith told QPS that Turner made up the claim and she stood by Berndt's note. (Burnside Decl., Ex. 5, Leith Dep. 88:15-18, 89:8-24, 90:1-4, 14, 19; Ex. 28, Def 000203)

59. On August 1, 2019, Leith contacted QPS, apologized and told them that Turner's

complaint about Moraski was accurate. (Burnside Decl., Ex. 5, Leith Dep. 103:6-16; Ex. 22, EEOC 0000678) Leith learned that Moraski harassed Turner when she investigated a claim from Adams that Moraski wanted to fight him. (Burnside Decl. Ex. 5, Leith Dep. 126:2-13; Ex.16) In her investigation of Adams' claim, Leith said she and Scholl interviewed Lor and Adams. She identified other employees who had issues with Moraski. She also interviewed Moore who told her he saw Moraski follow Turner as Turner was biking home, and Moraski threatened him. (Burnside Decl., Ex. 5, Leith Dep. 126:17-24, 127:1-13, 128:3-11; Ex. 16) Leith did not interview Moore on July 1, 2019, when Turner complained of harassment to QPS. (Burnside Decl., Ex. 5, Leith Dep. 127:21-24, 128:1-2, 23-24, 129:1)

60. Defendant terminated Moraski on August 1, 2019. In the termination letter, Defendant stated that Moraski violated its workplace violence policy and his behavior had been addressed in his annual review in July 2019 regarding how he communicated with coworkers. The letter was signed by Leith. (Burnside Decl., Ex. 18) In her investigation notes, Leith wrote that Moraski did not follow reporting procedures of informing the lead with work problems and was taking it upon himself to correct employees and often became loud and intimidating. Moraski was told to bring these issues to his lead, but he continued to handle it himself leading to several employee issues. (Burnside Decl., Ex. 16)

61. Leith admits that Moraski's conduct towards Adams was one of the same issues that Turner complained about. (Burnside Decl., Ex. 5, Leith Dep. 129:23-24, 130:1-7)

62. Leith admits that Lakeside was aware of Moraski's intimidating conduct as it was addressed in his annual review prior to Turner's termination. (*Id.*, Leith Dep. 133:6-12)

63. Defendant had information that Turner's complaint was true, but Defendant did not rehire Turner. (Burnside Decl., Ex. 4, Malczewski Dep. 97:1-3)

64. Lakeside's employee handbook and polices apply to permanent and temporary employees. (Burnside Decl., Ex. 4, Malczewski Dep. 12:22-24, 13:5-16; Ex. 5, Leith Dep. 45:20-23; Ex. 11)

65. The handbook dated May 1, 2015, was in place in 2019. (Burnside Decl., Ex. 11; Ex. 4, Malczewski Dep. 12:7-24, 13:1-7)

66. The handbook is discussed by human resources with permanent employees on their first day of work at orientation, and by the staffing firm with temporary employees. (Burnside Decl., Ex. 4, Malczewski Dep. 18:14-24, 19:1-12)

67. Defendant's "Policy Against Unlawful Harassment & Discrimination" includes race discrimination. (Burnside Decl., Ex. 4, Malczewski Dep. 24:20-24, 25:1-7; Ex. 11, Def 000348-50) Harassment is defined as verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his or her race. (Burnside Decl., Ex. 4, Malczewski Dep. 25:8-12; Ex. 11 Def 000348-50) Examples of harassment include: verbal or physical conduct that creates an intimidating, hostile or offensive working environment; unprofessional comments with respect to an individual's race; insults or name-calling based on race; jokes or other remarks that are demeaning to an individual's race; and physical, verbal or psychological abuse based on an individual's race. (Burnside Decl., Ex. 11, Def 000348-49)

68. Lakeside has a zero-tolerance regarding harassment and an employee will be fired if they commit racial harassment or discrimination. (Burnside Decl., Ex. 5, Leith Dep. 37:19-24, 38:1-3)

69. Lakeside admits that racial slurs, threatening violence or threatening to assault an employee based on race, calling a Black employee "nigger," and threatening a Black employee to beat his "nigger ass" are all violations of Lakeside's policy and Title VII. (Burnside Decl., Ex. 4, Malczewski Dep. 28:14-24, 29:1-16)

70. Lakeside agrees that if an employee is called a racial slur, this could create an intimidating, hostile and offensive environment and could unreasonably interfere with his work performance. (Burnside Decl., Ex. 4, Malczewski Dep. 33:21-24, 34:1-11)

71. Lakeside also agrees that if an employee is threatened with violence, it could create an intimidating, hostile and offensive environment, and interfere with his work performance. (Burnside Decl., Ex. 4, Malczewski Dep. 34:12-23)

72. Leith, Scholl, Berndt and Lor all agree that racial slurs, negative comments based on race and threatening someone with physical violence based on race would be a violation of Lakeside's harassment policy. (Burnside Decl., Ex. 5, Leith Dep. 36:18-24, 37:1-7; Ex. 6, Scholl Dep. 24:7-24, 25:1-12; Ex. 7, Berndt Dep. 33:7-18; Ex. 8, Lor Dep. 23:6-15)

73. The policy states harassment should be reported to your supervisor or Human Resources. (Burnside Decl., Ex. 11, Def 000350)

74. If a temporary employee believes they have been harassed, they should report the harassment to a supervisor, manager of Human Resources or to a QPS consultant. (Burnside Decl., Ex. 12)

75. Leads must report harassment to their supervisor and Human Resources. Supervisors must report harassment to Human Resources. (Burnside Decl., Ex. 4, Malczewski Dep. 27:3-22; Ex. 5, Leith Dep. 39:1-4, Ex. 6, Scholl Dep. 25:17-23, Ex. 8, Lor Dep. 23:16-24; Ex. 7, Berndt Dep. 33:19-24, 34:1-3) Leads and supervisors should take notes and

provide the information to HR. (Burnside Decl., Ex. 5, Leith Dep. 38:21-24)

76. Scholl said as a supervisor he did not have any training on investigating, documenting or interviewing witnesses regarding racial harassment or discrimination complaints. (Burnside Decl., Ex. 6, Scholl Dep. 26:8-20)

77. Lakeside will promptly and impartially initiate an investigation of discrimination and/or harassment. Lakeside prohibits retaliation against an employee who reports discrimination or harassment. (Burnside Decl., Ex. 11, Def 000350; Ex. 4, Malczewski Dep. 34:24, 35:1-2; Ex. 5, Leith Dep. 39:5-14)

78. Human Resources will gather data through witness statements and interviews, and make a determination on discipline in partnership with the division supervisor. (Burnside Decl., Ex. 4, Malczewski Dep. 27:23-24, 28:1-13) Human Resources should interview Leads, supervisors, and employees who worked around the victim of harassment and the harasser. (*Id.*, Malczewski Dep. 29:23-24, 30:1-20, 31:20-24, 32:1-5) Human Resources should also interview the person accused of harassment. (*Id.*, Malczewski Dep. 30:2-6) Human Resources should document the steps that were taken in an investigation and make a written summary of the investigation. (*Id.*, Malczewski Dep. 32:6-22) Investigation reports or summaries are retained indefinitely. (*Id.*, Malczewski Dep. 33:10-12)

79. Regarding the investigation of Turner's complaint, Lakeside said the best practice would have been to talk to everyone who worked first shift cones. (Burnside Decl., Ex. 4, Malczewski Dep. 47:11-20) Lakeside admits that if Moore would have been interviewed on July 1, 2019 when it learned about Turner's complaint from QPS, it would have known about the harassment. (*Id.*, Malczewski Dep. 48:3-8) Moore worked the same shift

as Turner and Moraski, and was a potential witness who should have been interviewed. (*Id.*, Malczewski Dep. 49:9-15, 50:10-16) Lakeside admits it only talked to the lead and supervisor, but no employees. (*Id.*, Malczewski Dep. 51:21-24) Lakeside had no documentation that Scholl or Berndt were asked for witnesses regarding Turner's complaint. (*Id.*, Malczewski Dep. 48:19-24, 49:1-8)

80. If a temporary employee is harassed or subjected to discrimination, Lakeside has a responsibility to address it. (Burnside Decl., Ex. 4, Malczewski Dep. 16:14-18) Lakeside also has a responsibility to ensure that discrimination and harassment does not occur in its workplace. (*Id.*, Malczewski Dep. 16:19-22)

81. If Human Resources receives a complaint that two employees are not getting along then Human Resources should discuss the unlawful harassment and discrimination policy with both employees, examine the situation, conduct an investigation or get witness statements to understand the nature of the situation, whether it does constitute harassment and discrimination or not. (Burnside Decl., Ex. 4, Malczewski Dep. 21:22-24, 22:1-9)

82. Lakeside is responsible for investigating harassment between its employees that occurs "off premises." (Burnside Decl., Ex. 4, Malczewski Dep. 43:22-24, 44:1-7; Ex. 5, Leith Dep. 76:6-24)

83. Training on the harassment policy is conducted at orientation when an employee starts work. There is no additional training after orientation on Title VII, harassment, or discrimination. (Burnside Decl., Ex. 4, Malczewski Dep. 26:16-19; Ex. 5, Leith Dep. 25:5-11)

84. Scholl did not know what Title VII is, and only received training on racial harassment and discrimination when he first started work at Lakeside in 1987. (Burnside Decl., Ex. 6,

Scholl Dep. 18:24, 19:1-4, 9-22)

85. Berndt and Lor did not know what Title VII is, and did not recall receiving training on racial harassment, discrimination or retaliation. (Burnside Decl., Ex. 7, Berndt Dep. 26:10-17, 27:5-11, 32:14-18; Ex. 8, Lor Dep. 19:3-7, 14-16, 22-24, 20:1-3)

86. The Equal Opportunity Employer policy states that Lakeside does not discriminate regarding firing or terms and conditions of employment based on race. (Burnside Decl., Ex.11, Def 000333)

87. Lakeside said supervisors should not discriminate against employees in relation to attendance and performance expectations. (Burnside Decl., Ex. 4, Malczewski Dep. 38:10-14)

88. Lakeside said if a Lead gives a note to a supervisor recommending termination of a temporary employee because he and another employee are not getting along, the supervisor will talk to the lead, look at the situation, the nature of the infraction, the frequency, nature, severity of the infraction, and the supervisor and HR will make a decision on discipline. (Burnside Decl., Ex. 4, Malczewski Dep. 40:10-20)

89. Supervisors and HR have a responsibility to ensure that conduct is not racially motivated. (Burnside Decl., Ex. 4, Malczewski Dep. 41:22-24, 42:1, 10-14)

90. Human Resources should ensure the EOE policy is enforced, and employees are not discriminated against based on race, and that Title VII is followed. (Burnside Decl., Ex. 4, Malczewski Dep. 42:15-21)

91. Lakeside's policy requires employees to call their immediate supervisor to report any absences or tardiness at least one (1) hour prior to the start of their normal work schedule. They can also leave a voicemail message. Tardiness is defined as being one minute late

for your scheduled shift. After three unscheduled absences in a rolling 12-month period, discipline may result. Lakeside follows Progressive Disciplinary Steps except where expressly provided in the attendance policy. (Burnside Decl., Ex. 11, Def 000340)

92. In the document assigning Turner to work at Lakeside, it states "You are not under Lakeside Plastic's attendance policy, as you are a QPS employee." (Burnside Decl., Ex. 12) However, QPS said at onboarding or orientation, QPS has the client employer's attendance policy and trains the temporary employees on the client employer's policy. (Burnside Decl., Ex. 2, Lee Dep. 22:4-11)

93. Leith admits the policy does not state how many tardies would result in discipline. (Burnside Decl., Leith 54:15-18, 55:12-16)

94. Lakeside's Progressive discipline policy applies to poor work performance or misconduct. Lakeside may combine or skip steps depending on the situation and nature of the offense. Factors to be considered are whether the offense is repeated despite coaching, counseling and/or training, the employee's work record, and the impact the conduct and performance issues have on the organization. Progressive discipline includes a verbal warning, written warning, final warning or Performance Improvement Plan (PIP), and suspension, demotion or discharge. (Burnside Decl., Ex. 11, Def 000351-52)

95. Lakeside's progressive discipline policy applies to temporary employees. (Burnside Decl., Ex. 4, Malczewski Dep. 53:12-22; Ex. 5, Leith Dep. 45:11-19)

96. Leads and supervisors can recommend progressive discipline. (Burnside Decl., Ex. 5, Leith Dep. 46:19-24; Ex. 7, Berndt Dep. 20:7-20; Ex. 6, Scholl Dep. 27:20-24, 28:1-21)

97. Before terminating an employee, HR investigates, meets with the supervisor, and gathers information from all the leads on the shift. (Burnside Decl., Ex. 5, Leith Dep. 47:17-24,

48:4-17)

98. Berndt had poor attendance but was not fired. Berndt admits that he had absenteeism and tardiness problems but was not fired. (Burnside Decl., Ex. 7, Berndt Dep. 58:17-23, 59:12-24, 60:1-24, 61:1-11) Scholl issued Berndt a verbal warning on October 2, 2019, for violation of Lakeside's attendance policy where Berndt had three unscheduled absences in August, September and October. Berndt was warned that "Attendance at work, on time and as scheduled, is a core requirement of your job description." (Burnside Decl., Ex. 21, Def 000404)

99. Turner denies stickering incorrectly. (Burnside Decl., Ex. 1, Turner Dep. 74:21-25, 75:1-8, 15-25, 76:1-15, 76:22-25, 77:1-6, 81:15-23)

100. The only document that Defendant relied on to terminate Turner based on its claim that he had poor work performance and inability to get along with coworkers is Berndt's note. (Burnside Decl., Ex. 26, Defendant's Amended Responses and Objections to Plaintiff's First Set of Requests for Production of Documents, Nos. 5 and 6, and Def 000202)


Dated: March 4, 2024            Respectfully submitted,

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

/s/ Tina Burnside
Tina Burnside (WI#1026965)
Senior Trial Attorney
Equal Employment Opportunity Commission
Minneapolis Area Office
330 South Second Avenue, Suite 720
Minneapolis, MN 55401
Email: tina.burnside@eeoc.gov
Telephone: (612) 552-7319

/s/ Greger Calhan
Greger Calhan

Trial Attorney
Equal Employment Opportunity Commission
Minneapolis Area Office
330 South Second Avenue, Suite 720
Minneapolis, MN 55401
Email: greger.calhan@eeoc.gov
Telephone: (612) 552-7323