UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

    Plaintiff,

v.                                                                        Case No. 22-CV-1149

LAKESIDE PLASTICS,

    Defendant.

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

        The Court should grant summary judgment in favor of the Defendant, Lakeside Plastics ("Lakeside") as to all of the Plaintiff's, Equal Employment Opportunity Commission's ("EEOC"), claims. Although the EEOC filed a voluminous amount of proposed "additional" facts and materials, it duplicated many of Lakeside's proposed facts and materials, thereby giving the appearance of multiple factual issues when that is not the case. The Court can and should grant summary judgment in favor of Lakeside because there is no genuine dispute as to any material fact and Lakeside is entitled to judgment as a matter of law.

        As to its first claim, the EEOC cannot prove that a racially hostile environment existed. The EEOC's alleged incidents of co-worker harassment are not enough to satisfy its burden. The EEOC also cannot show that there is a basis to impose liability on Lakeside. As to its second claim, the EEOC failed to come forward with evidence that Brian Turner ("Turner") was meeting Lakeside's legitimate expectations and that a similarly situated employee who is not in Turner's protected class was treated more favorably. As to its third claim, the EEOC failed to show that Turner engaged in an activity protected by the statute, as Turner's deposition testimony dooms his

1

claim. Moreover, the EEOC cannot prove that there is a causal link between the alleged protected activity and the adverse action. Lastly, there is no legal authority whatsoever in support of the EEOC's "race plus" claim. Thus, summary judgment in favor of Lakeside is appropriate.

## SUMMARY OF UNDISPUTED FACTS

Turner began his assignment at Lakeside on June 6, 2019. (LPF,[1] ¶1.) Turner was employed by QPS. (*Id.*, ¶2.) Lakeside had a temp-to-hire agreement with QPS with a 60-day evaluation period. (*Id.*, ¶32.) Turner's schedule was Thursday through Sunday, from 7:00 A.M. to 3:00 P.M. (*Id.*, ¶3.) Turner's last day was June 30, 2019. (*Id.*, ¶4.) Turner reported to Leads Max Berndt or Japan Lor. (*Id.*, ¶5.) Attendance was an essential function of the job. (*Id.*, ¶6.) Turner's responsibilities included excellent attendance, quality control, placing SKU stickers according to specifications, following directions of leads, and working as part of a team. (*Id.*, ¶¶12-16.) Turner admitted these were reasonable expectations. (*Id.*) Turner knew he needed to follow QPS' and Lakeside's attendance requirements. (*Id.*, ¶17.) Turner knew he was required to call QPS and Lakeside to report an absence or being late. (*Id.*, ¶¶6, 19, 27.)

Lakeside's policies regarding discrimination and harassment apply to temporary employees. (*Id.*, ¶29.) The handbook is discussed by the staffing firm with temporary employees. (EEOC Facts, ¶66.) Turner knew he should report harassment to his lead and to QPS. (LPF, ¶8.) QPS encouraged temporary employees to contact QPS if they were having a problem at the job site. (*Id.*, ¶10.) Turner knew he should report any concerns of harassment immediately. (*Id.*, ¶11.) Turner admitted that he did not report the alleged incidents to QPS when they occurred. (*Id.*, ¶103.)

On July 1, 2019, Scott Scholl (Safety Division Supervisor) sent an e-mail to Kelly Leith (HR Director) that he wanted Turner replaced and attached a note from Berndt. (*Id.*, ¶¶49-51.)

---

[1] "LPF" refers to Lakeside's Reply to the EEOC's Response to Lakeside's Proposed Facts.

Leith then reviewed Turner's attendance records. (LPF, ¶45.) In 3 weeks, Turner was late or absent on 3 days. (*Id.*, ¶¶46, 58-60; EEOC Facts, ¶30.) Leith also relied upon Berndt's note. (LPF, ¶48; EEOC Facts, ¶38.)

On July 1, 2019, after QPS informed Turner that Lakeside terminated his assignment, Turner reported racial harassment to QPS. (EEOC Facts, ¶50.) QPS stated: "We spoke with Brian and he is not happy about the decision, He felt like this was unfair because one of Lakeside's employee drove up to him while he was biking home and 'threaten to beat up his ass.' Brian is not happy and will be getting a lawyer involve. Brian said he will also reach out to Lakeside and we told him that we are his employer so he should not be calling Lakeside. We are trying to get a hold of Brian again so we can get a written statement from him." (LPF, ¶63.) QPS asked Leith not to speak with Turner. (*Id.*, ¶70.) Leith determined that the claim was not substantiated. (*Id.*, ¶69.)

Initially, Turner felt his co-worker, Curt Moraski, was down-to-earth. (*Id.*, ¶72.) Moraski gave Turner rides home. (*Id.*, ¶¶73-74.) After a couple of days, Moraski and Turner were discussing Milwaukee and getting to know each other. (*Id.*, ¶75.) Moraski stated, "While I was there, I used to knock niggers out on the south side." (*Id.*, ¶76.) Turner told him he didn't care about that type of conversation, and Moraski said we can go out and talk in the parking lot. (*Id.*, ¶77.) Turner admitted that Moraski did not make the racial slur directly towards him. (*Id.*, ¶78.) After that, Moraski walked away, and Turner kept his distance. (*Id.*, ¶79.) Turner initially testified he did not report the conversation to any of his Leads; Turner stated, "When it came out to going outside and stuff like that, it was a different situation, but no. When it came out to the following me home and stuff like that, yes." (*Id.*, ¶80.) Turner later testified that he reported it to Lor. (*Id.*)

In the second incident, Moraski pulled up to Turner in his truck while Turner was biking home. (*Id.*, ¶82.) According to Turner, this occurred on a Friday or Saturday; it was snowing and

3

going into the winter season. (*Id.*, ¶83.) Moraski told Turner to get off his bike and fight and said he would "knock [his] nigger ass out." and "I'm gonna hang your nigger ass." (*Id.*, ¶84.) Turner told him he didn't have time for it and Moraski drove off. (*Id.*, ¶85.) Turner crossed the street, after which Moraski came back and made the same statements. (*Id.*, ¶86.) Turner contacted the Oshkosh Police and made a report, but there is no record of it. (*Id.*, ¶¶87-89.) After the incident, Turner vented to his co-worker, Keith Moore. (*Id.*, ¶90.) Turner also said he told Berndt about it. (*Id.*, ¶91.) This was the first time that Berndt was Turner's Lead. (*Id.*, ¶91.) Berndt did not ask questions and did not respond; rather, "his main thing was just assigning [Turner] to where [he] was going to be at for the day." (*Id.*, ¶94.) Later, Moraski came over and tried to show Turner how to put labels on boxes. (*Id.*, ¶96.) Turner felt that Moraski was overstepping. (*Id.*, ¶97; EEOC Facts, ¶14.) Moraski did not make any racial slurs. (LPF, ¶98.) Turner told Berndt about it and Berndt told him to go back and do his job. (*Id.*, ¶99.) Turner told Berndt he had somebody making him feel unsafe and threatened his life. (*Id.*, ¶100.) Turner admitted he told Berndt "I feel like you're all trying to play me like a fucking idiot, and I'm about to call QPS." (*Id.*, ¶101.) Berndt told him you don't have to do that and moved Turner to another area. (*Id.*; EEOC Facts, ¶17.) Moraski stayed away from Turner after that. (LPF, ¶102.) Berndt thought Moraski was an intense individual. (*Id.*, ¶55.) Moraski was not a trainer or a Lead. (EEOC Facts, ¶4.) In Moraski's review on June 27, 2019, Lakeside addressed Moraski's communications with others. (LPF, ¶124.) Moraski submitted a written statement on July 16, 2019, regarding issues he had with Turner. (*Id.*, 108.)

Other than these alleged incidents, Turner was not subjected to racial slurs at any other time at Lakeside and did not have any other negative interactions with Moraski. (*Id.*, ¶¶104, 106.) Turner stated that it "seemed somewhat like a family there." (*Id.*, ¶105.)

4

On July 31, 2019, Leith and Scholl met with Alex Adams, who is white; Moraski was making threats to him that he "can kick everyone's ass" that he was "going to follow Alex out to the car and kick his ass when off work property" and that "he should be training everyone as everyone else is a dumbass in the facility." (*Id.*, ¶116-118.) On August 1, 2019, Leith and Scholl met with Moore. (*Id.*, ¶119.) Moore confirmed Adams' report. (*Id.*, ¶120.) Moore also reported Moraski threatening Turner. (*Id.*, ¶121.) Leith and Scholl met with Moraski. (*Id.*, ¶122.) Moraski was very loud and agitated. (*Id.*, ¶115.) Leith and Scholl terminated Moraski's employment. (*Id.*, ¶123.) Leith then contacted QPS. (*Id.*, ¶125.) Leith apologized and stated that Moraski was no longer with Lakeside. (*Id.*, ¶126.) QPS asked if Turner would be eligible to return if he wants to return; Leith said to let her know and she would follow up with his supervisor. (*Id.*, ¶127.)

Moore has been employed by Lakeside since 2014. (*Id.*, ¶129.) Moore is African American. (*Id.*, ¶130.) Moore trains temporary employees. (*Id.*, ¶131.) Moore testified that Lakeside does not tolerate discrimination and treats everyone equal and fair. (*Id.*, ¶132.) Moore testified that Turner and Moraski had some disagreements where they couldn't work together. (*Id.*, ¶136.) Moore described Moraski as cocky. (*Id.*, ¶143.) Moore testified that Moraski never came at him with any name calling. (*Id.*, ¶144.) Moore never heard Moraski make racial comments. (*Id.*, ¶149.)

Lor is a Production Shift Lead. (*Id.*, ¶151.) The Production Shift Lead makes sure that Lakeside keeps all lines running and has its crew placed at certain stations to keep the workflow moving; Leads supervise Production Technicians. (*Id.*, ¶152.) Lor and Berndt covered different shifts. (*Id.*, ¶154.) Berndt became a Lead in 2008 or 2009. (*Id.*, ¶164.) Leads did not have firing authority but could make recommendations. (EEOC Facts, ¶3.) Leads must report discrimination or harassment of which they are aware. (Lakeside Facts, ¶157.) Neither Lor nor Berndt heard Moraski make racial remarks or comments. (Lakeside Facts, ¶¶159, 165.)

Turner told Lor that he did not get along with Moraski and could not work with him. (*Id.*, ¶162; EEOC Facts, ¶9.) Lor then had them work in separate departments. (LPF, ¶163; EEOC Facts, ¶9.) Moore also told Lor that he could not work with Moraski due to his attitude and Lor separated them into different departments. (EEOC Facts, ¶10; LPF, ¶161.) Berndt was aware that Turner and Moraski were having a conflict and their working relationship was contentious. (LPF, ¶167.)

Scholl supervises Leads. (*Id.*, ¶173.) Scholl makes recommendations to Human Resources regarding discipline. (*Id.*, ¶175.) Human Resources is responsible for taking disciplinary action. (*Id.*, ¶176.) Leith had hiring and firing authority. (*Id.*, ¶181.) Human Resources is responsible for investigating discrimination and harassment complaints of which it is aware. (*Id.*, ¶177.) Berndt was not always calm or patient with new employees. (EEOC Facts, ¶42.) Berndt has been late for work and has been disciplined for absenteeism and tardiness but not fired. (EEOC Facts, ¶98.)

## **ARGUMENT**

### I. LAKESIDE DID NOT DISCRIMINATE AGAINST TURNER BY SUBJECTING HIM TO A HOSTILE WORK ENVIRONMENT BASED UPON RACE.

Based upon the undisputed material facts and applicable law, Lakeside is entitled to summary judgment. The EEOC failed to show that the alleged harassment was so severe or pervasive so as to alter the conditions of Turner's work environment by creating a hostile or abusive situation. It also failed to show that there is a basis for employer liability.

#### A. THERE WAS NO RACIALLY HOSTILE ENVIRONMENT.

The EEOC first argued that the Court should find that a racially hostile environment existed because the alleged incidents involved "racial slurs and threats of racial violence," without consideration of the context of the workplace and the totality of the circumstances (Dkt. 31, p. 15-16). In *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022), the Court stated that "we should not be concerned with the number of times a racial epithet is used" and "[w]hat matters

6

is looking to the totality of the circumstances when determining whether the conduct is sufficiently severe or pervasive to be actionable." Courts have reiterated the "importance of considering the entire context of the workplace" and "not the discrete acts of individual employees." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002); *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011), aff'd, 570 U.S. 421 (2013). Here, when evaluating the entire context of the workplace, the undisputed facts show that there was not a racially hostile environment.

The EEOC's reliance on *Cerros*, 288 F.3d at 1047, is misplaced. In *Cerros*, the plaintiff's co-workers and supervisors referred to him with racially derogatory names over a significant period. *Id*. at 1042. There was also racist graffiti, and the plaintiff's tires were slashed. *Id*. The plaintiff confronted his supervisor. *Id.* at 1043. The plaintiff also reported it to other supervisors. *Id.* The plaintiff then reported it to the General Manager, who took no action and the racial epithets continued. *Id*. The Court held that "[a]lthough Title VII does not guarantee a happy workplace, it does provide protection for employees who suffer from discriminatory terms and conditions of employment through a work environment that is permeated with racial epithets that are tolerated by the employer." *Id.* at 1047-48. The Court distinguished the facts from cases in which a plaintiff was a recipient of insults because of a workplace altercation, a case in which there were "only a few verbal utterances in the context of office banter," and a case in which there was one isolated racial epithet in response to the plaintiff's already inappropriate conduct. *Id.* at 1047.

This is not a case where Turner experienced a work environment that was permeated with racial epithets that Lakeside tolerated. The instant case involves one alleged incident of a racial slur in the context[2] of co-workers getting to know each other; Turner's own testimony established that Moraski did not direct it towards him, and Turner did not view it as severe. (LPF, ¶¶72, 75-

---

[2] The EEOC admitted that the Courts should carefully consider the "social context in which particular behavior occurs and is experienced by its target." (Dkt. 31, p. 16.)

7

Case 1:22-cv-01149-WCG    Filed 03/18/24    Page 7 of 16    Document 35

78, ¶80.) Lor separated Turner and Moraski into different departments. (LPF, ¶163; EEOC Facts, ¶9.) The second alleged incident occurred off-premises (while snowing, according to Turner). (LPF, ¶¶82-83.) Turner did not report it to QPS and the Oshkosh Police Department has no record of it. (*Id.*, ¶¶, 87, 103.) The third alleged incident did not involve any racial comments, and Turner also exchanged words with Moraski. (*Id.*, ¶¶98, 108-109.) Berndt separated Moraski and Turner into different work areas. (EEOC Facts, ¶17.) Turner was not subjected to racial slurs at any other time and did not have any other negative interactions with Moraski. (LPF, ¶¶104, 106.) Turner's own testimony established that it "seemed somewhat like a family there." (*Id.*, ¶105.) Moore's testimony affirmed that. (*Id.*, ¶133.) Indeed, Turner's own testimony established that it was not a racially hostile environment at all, let alone one permeated by racial epithets. Rather, the alleged incidents involved discrete acts of a co-worker and are not enough to satisfy the EEOC's burden.

The EEOC also relied upon *Henderson v. Irving Materials, Inc.*, 329 F.Supp.2d 1002, 1008-09 (S.D. Ind. 2004), but the facts of *Henderson* are clearly distinguishable. In *Henderson*, the plaintiff was the only black employee and "endured continuous and relentless" racial harassment. *Id.* at 1004. There were frequent racist jokes and racial slurs. *Id.* at 1006. The plaintiff told his co-workers he "didn't care to hear that mess," but it continued. *Id.* The plant manager heard the racist jokes and laughed at them. *Id.* In addition, someone cut buttons off the plaintiff's work uniforms and vandalized his work truck. *Id.* A co-worker told the plaintiff that no one wanted him there, and he should get another job; again, the plant manager was present. *Id.* Co-workers made comments about membership in the KKK, and the plant manager joined in. *Id.* Around the same time, a co-worker made a comment about dragging the plaintiff behind his truck and told him to come out in the field and fight; the plant manager heard it. *Id.* In another incident, a co-worker drove through the parking lot at a high rate of speed and tried to hit the plaintiff. *Id.* at

8

1006-1007. The plaintiff reported it. *Id.* at 1007. However, the co-worker did it again. *Id.* The plaintiff later found dead mice planted in his truck. *Id.* The plant manager posted a sign in response. *Id.* The plaintiff then reported it to the General Manager, who initially issued written warnings but then rescinded them. *Id.*

In considering the alleged incidents as a whole and the totality of the circumstances, the incidents were sufficient in *Henderson* to allow a reasonable jury to find that the plaintiff's work environment was severe, pervasive, and abusive under Title VII. *Id.* at 1016. Notably, the Court distinguished other cases, including *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 641 (7th Cir. 2001), as not comparable in "magnitude to the things said and done" and "easily distinguishable in terms of severity." *Id.* at 1012. Here, the magnitude, severity, and frequency of the incidents in *Henderson*, as well as the direct involvement of the plant manager, make *Henderson* easily distinguishable. Indeed, the facts of *Logan*, are far more comparable and require a finding that the alleged incidents do not rise to the level of an objectively hostile environment ("the plaintiff's co-worker expressed his view that 'interracial relationships were disgusting,' that blacks caught in a particular area of town 'could get lynched,' and that if plaintiff wanted to keep her job, she had better 'get along with him.'") *Henderson*, 329 F. Supp. 2d at 1012, citing *Logan*, 259 F.3d at 638. The alleged incidents of racial harassment in this case are not sufficient to allow a reasonable jury to find that Turner's work environment was severe, pervasive, and abusive under Title VII.

    **B.    THERE IS NO BASIS FOR EMPLOYER LIABILITY.**

Because the EEOC cannot satisfy the third element of its claim, the Court need not reach the fourth element – whether there is a basis for employer liability. To the extent that the Court considers it, however, the EEOC also cannot prove that there is a basis for employer liability.

9

The EEOC argued that Turner followed the procedures to report alleged harassment because he reported the alleged incidents to Lor and Berndt, respectively. Notably, Turner testified inconsistently on whether he reported the first incident to Lor. (LPF, ¶80.) With regard to the second incident, Turner testified that it was snowing and going into the winter season. (*Id.*, ¶83.) Even when the EEOC attempted to rehabilitate Turner's testimony, he still testified that some of the incidents with Moraski happened in June "but, like, the other incidents, it was probably like in fall season, because I do remember it being cold, and it was raining." (LPF, ¶83.) This is not a credibility issue, as the EEOC's arguments contradict the Complainant's own testimony. See *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985). The EEOC is not entitled to a jury trial to determine which one of Turner's versions of the facts is the correct one (if any).

Turner also admitted that if you witness anything or are going through anything, you should report it to your lead *and* to QPS. (*Id.*, ¶8.)[3] QPS encouraged temporary employees to contact QPS if they were having a problem at the job site. (*Id.*, ¶10.) Turner knew that he should report any concerns of harassment immediately. (*Id.*, ¶11.) Turner admitted that he did not report the incidents to QPS when they occurred. (*Id.*, ¶103.) Turner did not report the alleged harassment to QPS until after his termination. (EEOC Facts, ¶50.) Even then, QPS' report to Lakeside did not reference racial harassment, and QPS directed Lakeside not to contact Turner.[4] (LPF, ¶¶63, 70.) QPS said it would get a written statement. (*Id.*, ¶63.) Thus, a reasonably jury could find that Turner failed to report the alleged incidents to QPS—a mechanism he was aware of and admitted he was required

---

[3] Relatedly, the EEOC's argument that Lakeside "cannot escape liability simply by the existence of a policy" (dkt. 31, p. 22) is misplaced and not relevant given Turner's own testimony concerning reporting harassment to QPS.
[4] The EEOC's assertion that Leith admitted that QPS told her about the racial harassment complaint on July 1, 2019, is false and the deposition excerpts cited by the EEOC do not support its statement. Even apart from that, it is undisputed that Turner did not report it to QPS until after he learned of the termination of his assignment.

to follow (immediately)—such that Lakeside cannot be held liable for the alleged co-employee racial harassment. See *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 549 (7th Cir. 2011).

The evidence also does not support a finding that Lakeside was negligent in discovering or remedying the alleged harassment. Again, the EEOC's response ignored Turner's conflicting testimony. The EEOC also attempted to contradict Turner's testimony that he did not tell Berndt he didn't want to work around Moraski the day of the third alleged incident. (*Id.*, ¶93.) At most, the evidence shows that Lor and Berndt were aware that Turner and Moraski did not get along, and both assigned Turner and Moraski to different work areas, which was effective. Even if they knew more, there is no evidence that Turner experienced any other alleged incidents of racial harassment. (*Id.*, ¶¶104-106.) Indeed, the third alleged incident did not involve any racial harassment, nor do the facts support a finding that Lakeside "allowed Moraski to continue to terrorize Turner," as argued by the EEOC. (Dkt. 31, p. 21.) By Turner's own account, he felt that Moraski was overstepping by showing him how to do his job. (*Id.*, ¶97; EEOC Facts, ¶14.) "A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation." See *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998). Here, no reasonable factfinder could conclude that Lakeside was negligent in discovering or remedying the alleged harassment, and the EEOC's attempts to distinguish *Paschall*, which is on point, are unconvincing.

## II. LAKESIDE DID NOT TERMINATE TURNER BASED UPON HIS RACE.

In *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 807 (7th Cir. 2017), decided after *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Court stated that a plaintiff "may prove race discrimination either directly or indirectly, and with a combination of direct and circumstantial evidence." It also stated that the "direct" and "indirect" methods "are not subject to different legal standards" and retained the *McDonnell Douglas* "burden-shifting framework." *Id.*

11

at 807. Under that framework, "[t]he plaintiff carries the initial burden of establishing a prima facie case of discrimination, which can be accomplished by setting forth evidence that: '(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *Id*. To defeat summary judgment, the EEOC must come forward with evidence that Turner was meeting Lakeside's legitimate expectations and that a similarly situated employee who is not in his protected class was treated more favorably. See *id.* at 808. The EEOC failed to do so.

In about 3 weeks, Turner was late or absent on 3 days. (*Id.*, ¶46.) Although the EEOC characterized this as "good attendance" and attempted to explain Turner's failure to contact Lakeside to report his absences, this is contrary to undisputed evidence. Turner was required to contact Lakeside and had specific instructions on how to report absences. In addition, although Berndt's note did not address attendance, Leith reviewed Turner's attendance records. (LPF, ¶45.) Turner admitted that when he reported the alleged incidents to Berndt, this was the first time that Berndt was his Lead, such that Berndt likely had no information on Turner's attendance. (*Id.*, ¶92.) Berndt's note reported performance issues and issues getting along with others, including Berndt. (*Id.*, ¶51.) Therefore, Turner was not meeting Lakeside's legitimate expectations.[5] Turner knew the expectations and agreed they were reasonable. (LPF, ¶¶12-16, 26-27.)

The EEOC also failed to show that a similarly situated employee who is not in Turner's protected class was treated more favorably. The EEOC only proffered Berndt as an alleged comparator, yet the undisputed evidence shows that Berndt is not a comparator. Berndt became a

---

[5] Although the EEOC claimed that Lakeside could have given Turner a warning for his attendance issues and performance issues, this does not prove race discrimination. The attendance policy stated, "if you are in violation of the attendance policy you are subject to disciplinary action up to and including termination." (EEOC Facts, ¶91.)

12

Lead in 2008 or 2009. (LPF, ¶164.) Leads supervise Production Technicians. (*Id.*, ¶152.) Leads also had the authority to recommend termination. (EEOC Facts, ¶3.) Turner and Berndt do not have similar job positions or responsibilities, and "ordinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee." *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Moreover, Berndt was a long-term employee, whereas Turner was a temporary employee who was late or absent on 3 days in his first 3 weeks, within a 60-day evaluation period. Therefore, the EEOC failed to show that Turner was treated less favorably than similarly situated co-workers.

Because the EEOC failed to establish a prima facie Title VII race discrimination claim, the Court should grant summary judgment. Even though the EEOC attempted to challenge the accuracy of the information in Berndt's note regarding Turner's work performance and inability to get along with others, there is no evidence that Lakeside's decisionmakers terminated Turner's assignment because of his race. In fact, Leith later followed up with QPS on August 1, 2019, after she learned about Moraski threatening others and that Moore had seen Moraski threaten Turner.

Even if Scholl and Leith relied upon incorrect information from Berndt about Turner's conduct and work performance (which is not the case), it is not a basis to find race discrimination.[6] See *Buchanan v. Tower Auto., Inc.*, 31 F. Supp. 2d 644, 657 (E.D. Wis.), aff'd, 202 F.3d 272 (7th Cir. 1999); *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560-61 (7th Cir. 1987). Further, there is no evidence that Lakeside failed to follow a regularly enforced policy that it followed in similar situations.[7] Scholl testified that he consistently accepted recommendations from the Leads and did not conduct independent investigations. (EEOC Facts, ¶25.) Consequently, the evidence does not

---

[6] Relatedly, as to this claim, the EEOC did not make any argument (nor is there any evidence) that Berndt was racially biased and used the handwritten note "as a dupe in a deliberate scheme to trigger a discriminatory employment action." See *Johnson*, 726 F.3d at 914.

[7] Thus, *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 882 (7th Cir. 2016) does not apply.

13

permit a reasonable jury to conclude that Lakeside terminated Turner's assignment because of his race, and the Court should grant summary judgment in favor of Lakeside.

**III.     LAKESIDE DID NOT RETALIATE AGAINST TURNER.**

To defeat summary judgment, the EEOC must offer evidence from which a reasonable jury could find that Turner: (1) engaged in an activity protected by the statute; (2) suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. See *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022). The EEOC's argument that Turner engaged in protected activity when he made reports to Lor and Berndt would require the Court to disregard Turner's own inconsistent testimony. The Court should decline to do so and should find that Turner's deposition testimony dooms the EEOC's claims. The EEOC also cannot establish a causal link between Turner's alleged reports and his termination.

The EEOC first argued that the Court should infer causation because of "suspicious timing." (Dkt. 31, p. 29). However, this argument is specious as the timing of Turner's alleged reports to Berndt cannot be established due to Turner's own conflicting testimony. In addition, there is no evidence whatsoever that Scholl or Leith had any knowledge of Turner's alleged reports to Lor and Berndt when Lakeside terminated Turner's assignment. See *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001). Therefore, the timing does not establish causality at all.

The EEOC next argued that the Court should find causality because the decisionmaker "operated as a cat's paw for Berndt." (Dkt. 31, p. 29.) However, there is no evidence to support that Berndt's termination recommendation was "a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Vesey v. Envoy Air, Inc*., 999 F.3d 456, 461 (7th Cir. 2021), citing *Johnson*, 726 F.3d 910, 914 (7th Cir. 2013). Indeed, the EEOC cannot prove discriminatory animus on the part of Berndt. For instance, in *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), the

biased supervisors made negative comments about the plaintiff's military obligations, thereby demonstrating animus. Here, there is no such evidence, and the Court is not required to draw inferences that "are supported by only speculation and conjecture." See *Johnson*, 726 F.3d at 915. At most, the evidence shows that Berndt was not always calm or patient with temporary employees, especially when he had to stop what he was doing to show them how to perform the job after the trainer already did so; this was true regardless of their race. (EEOC Facts, ¶42.) Furthermore, Turner admits he told Berndt "I feel like you're all trying to play me like a fucking idiot…" as reflected in Berndt's note. (Lakeside, ¶¶51, 101.)

The EEOC next argued that the Court should find Berndt "exhibited animus" by ignoring Turner's harassment complaints, based solely on *Younker v. City of Wood River, Illinois*, No. 22-CV-204-JPG, 2023 WL 3258218, at *10 (S.D. Ill. May 4, 2023). In that case, there were "several factors" that could lead a jury to find sexual orientation animus, including offensive comments, as well as hostility or "utter indifference" toward equal treatment of lesbian employees in hearing complaints. *Id.* No such evidence exists in this case. According to Turner, Berndt apparently had no reaction to Turner's report. The Court should reject the EEOC's argument. The Court should also reject the EEOC's argument that Lakeside retaliated against Turner by "refusing to rehire" him as no evidence exists to support that. QPS asked Leith if Turner would be eligible to return if he wants to return, and Leith said to let her know and she would follow up with his supervisor. (*Id.*, ¶127.) There was no refusal to rehire on the part of Lakeside.

Lastly, the Court should decline to make new law and find that Lakeside retaliated against Turner because of his race and his complaints of harassment. The EEOC admits there is no legal authority to support such a claim in the 7th Circuit and did not cite any legal authority from any other jurisdictions.

## CONCLUSION

Based upon the foregoing, as well as Lakeside's opening brief and materials, the Court should grant summary judgment in favor of Lakeside.

Dated this 18th day of March, 2024.		RENNING, LEWIS & LACY, S.C, Attorneys for Plaintiff, Lakeside Plastics

s/Jenna E. Rousseau
Tony J. Renning
State Bar No. 1041465
Jenna E. Rousseau
State Bar No. 1065236

P.O. Address
Attorney Tony J. Renning
Renning, Lewis & Lacy, s.c.
43 W. 6th Avenue
Oshkosh, WI 54902
920-420-7527
trenning@law-rll.com

Attorney Jenna E. Rousseau
Renning, Lewis & Lacy, s.c.
205 Doty Street, Suite 201
Green Bay, WI 54301
920-283-0708
jrousseau@law-rll.com